270 N.J. Super. 296 (1994)
637 A.2d 184
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
PEDRO LABOY, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 3, 1994.
Decided February 3, 1994.
*297 Before Judges BAIME, CONLEY and VILLANUEVA.
*298 J. Michael Blake, Assistant Deputy Public Defender, argued the cause for appellant (Zulima v. Farber, Public Defender, attorney; Mr. Blake, of counsel and on the brief).
Nancy Peremes Barton, Deputy Attorney General, argued the cause for respondent (Fred DeVesa, Acting Attorney General, attorney; Ms. Barton, of counsel and on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Following a protracted jury trial, defendant Pedro Laboy was found guilty of murder (N.J.S.A. 2C:11-3a(1) and (2)) and conspiracy to commit that offense (N.J.S.A. 2C:5-2, N.J.S.A. 2C:11-3a(1) and (2)).[1] On the murder conviction, defendant was sentenced to life imprisonment with a 30 year parole disqualifier. The trial court imposed a concurrent sentence of 15 years on the conspiracy count.[2] In addition, defendant was assessed penalties totalling $1,030 payable to the Violent Crimes Compensation Board.
Defendant advances a plethora of arguments challenging the validity of his convictions. His principal contention is that his right to confrontation was violated by admission of his codefendant's hearsay statement blaming him for the killing. Defendant further claims that this error was compounded by the trial court's *299 failure to provide the jury with any guidance concerning how it was to consider his incriminatory statements. We agree.
Although the evidence of guilt was substantial, we are constrained to reverse defendant's convictions. We hold that the trial court committed error of constitutional dimension when it admitted evidence relating to a non-testifying codefendant's confession directly inculpating the defendant in the crimes charged. We also conclude that the trial court's instructions to the jury were faulty in various particulars. Our review of the record convinces us that defendant was deprived of a fair trial.

I.
On January 19, 1989, Sara Pharo's lifeless body was found embedded in the sand on a beach located in Carneys Point Township. The police were immediately summoned. From a clearing in the grass approximately 70 feet from the body, the police recovered a log bearing traces of blood consistent with the victim's blood type. Nearby, the police later discovered a "no trespassing" sign lying in the water.
Although it was apparent that Pharo's body had been submerged beneath the waters of the Delaware River for some time, the cause of death was not drowning. Instead, the evidence disclosed that the victim had been badly beaten and had died as a result of the injuries inflicted.
The State's two experts differed respecting the precise cause of Pharo's death. Dr. Robert Breckenridge, a board certified pathologist employed by the Salem County Medical Examiner's office, concluded that, despite the numerous injuries inflicted on the victim, it was a single blow by a "rather sharp instrument[]" that deeply lacerated her scalp and caused a fracture of the base of the skull, followed by "compression" and hemorrhage of the brain, which resulted in her death. The pathologist observed that the "no trespassing" sign, with its sharp edges on two sides, "could very well have been the instrument causing the laceration of the scalp and [the] fracture of the skull." He added that the log and *300 various rocks found near the victim's body did not have sharp edges and could not have been the instrument that inflicted the fatal blow.
Dr. Ronald Suarez, an Assistant State Medical Examiner, agreed with Dr. Breckenridge that Pharo's body evidenced a skull fracture with "subtentorial hemorrhage[,]" but was "unable to [conclude]" that the blow causing that injury resulted in death. Instead, Dr. Suarez pointed to "a half dozen blows easily identifiable as separate from each other" and concluded that "[t]he accumulation of all the injuries caused [the victim] to die."
Pharo, a 13 year old eighth grade student who resided with her parents and brother, was last seen alive by her mother at approximately 5:30 p.m. on January 17, 1989. Shortly after the victim's body was discovered, the police investigation focused upon the defendant who was then 15 years old and resided in the same apartment complex as the victim. Defendant had confided to a friend, Jose Hernandez, that Pharo was rumored to be pregnant and he the father. On the next day, defendant's mother, in Hernandez's presence, asked defendant to summon Pharo in order to discuss her purported pregnancy. According to Hernandez, while walking to Pharo's apartment, defendant "started breaking down." Defendant told Hernandez that he and Matthew Vincent had killed the victim. Defendant said that "they [had] hit her with a stick" and had left her on the beach. Hernandez accompanied defendant to the river, but they were unable to find Pharo's body due to the rising tide. Defendant exclaimed that he would "probably kill himself" if he were sentenced to life imprisonment.
Defendant and Vincent were apprehended on January 19, 1989. Lieutenant Dennis Sample of the Salem County Prosecutor's office interviewed defendant at the Carneys Point Police Department on that date. Also present were the defendant's mother and several law enforcement officers. Sample advised defendant of his constitutional rights. Both defendant and his mother acknowledged their understanding of these rights by signing the back of a Miranda card. Before commencing the interrogation, Sample *301 told defendant that he had previously interviewed Vincent and that Vincent had blamed the defendant for most of the violence. Defendant then gave the police an oral statement which was subsequently repeated and tape recorded.
In his statement, defendant vividly described the brutal beating inflicted upon the victim. Defendant recounted that Vincent had arranged to meet Pharo at the baseball field near the highway. Defendant was somewhat evasive concerning the purpose of the meeting. At one point, defendant admitted that earlier that day he and Vincent had planned to kill the victim. Later in his statement, defendant equivocated, noting that Vincent said Pharo was pregnant and that he was going to "hurt her." Defendant claimed that he agreed to participate in the killing because he believed Vincent was merely "joking." In any event, the two met Pharo at the baseball field and chased her to the river. According to defendant's account, Vincent struck the victim's head with a rock approximately the size of a "softball." Both defendant and Vincent repeatedly hit the victim with a stick and a "club" that they found on the beach. Each time Vincent "picked [the victim] up" defendant would "kick[] her." When Pharo fell into the water, defendant and Vincent rolled up their trousers and waded into the river so that they could "choke[] her" and "hold[] her down." They held the victim under water and, after she stopped kicking, dragged her on to the beach where Vincent struck the victim with a sign post. Defendant recounted how Vincent picked up the "no trespassing" sign and shouted that he was "gonna bash [the victim's] head open" with it. Defendant claimed that he turned away at that point and did not actually observe the blow inflicted upon the victim. Vincent also applied pressure to her throat by pressing the sign post into her neck, face and chest. The victim's eyes "rolled back in her head" and she appeared "cursed." The two then fled the scene.
Because of inconsistencies in their accounts of the incident, Sample decided to interview defendant and Vincent together. Sample testified that the two "jok[ed] with each other about how *302 they had killed [the victim] [and] how her eyes had rolled back" into her head. Following this joint interview, Vincent gave an additional statement in which he "admitted to being more involved in the violence."
At trial, defendant's tape recorded statement was played before the jury. In addition, Sample briefly described his joint interview with defendant and Vincent. Over defense counsel's objection, Sample testified that prior to questioning the defendant, he apprised him that Vincent had given a statement blaming him for the killing. Sample was also permitted to testify that before interviewing defendant and Vincent jointly, he told the boys and their mothers that there were "inconsistencies" in their statements and that "Matthew was blaming most of the violence on Pedro." No limiting instruction was given to the jury concerning Vincent's statement inculpating the defendant. So too, the trial court failed to instruct the jury respecting its consideration of defendant's confession. We will deal with these points later in our opinion.
Juvenile delinquency complaints were filed against both defendant and Vincent. On April 16, 1990, the Family Part ordered that defendant be tried as an adult. Several days later, defendant, who had been detained in the Cumberland County Juvenile Detention Center for more than a year, attempted to escape. He was apprehended shortly thereafter. Testimony relating to defendant's unsuccessful attempt to flee was presented at trial as evidence of consciousness of guilt. It is against this backdrop that we consider the arguments advanced by defendant on appeal.

II.
We first consider the contention that the trial court erred by admitting testimony relating to Vincent's statement in which he placed most of the blame for the killing on the defendant. We hold that admission of this evidence violated defendant's Sixth Amendment right to confrontation and New Jersey's common law.
*303 Our analysis begins with the Sixth Amendment's prescription that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]" U.S. Const. amend. VI. This right is secured for defendants in state as well as federal criminal proceedings. Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The primary interest advanced by the Confrontation Clause is the right of cross-examination. Kentucky v. Stincer, 482 U.S. 730, 736, 107 S.Ct. 2658, 2662, 96 L.Ed.2d 631, 641 (1987) (quoting Douglas v. Alabama, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934, 937 (1965)). The opportunity for cross-examination has been characterized as the "`greatest legal engine ever invented for the discovery of truth[,]'" California v. Green, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489, 497 (1970) (quoting 5 Wigmore on Evidence § 1367 (3d ed. 1940)), and is "critical for ensuring the integrity of the fact-finding process[,]" Kentucky v. Stincer, 482 U.S. at 736, 107 S.Ct. at 2662, 96 L.Ed.2d at 641. Cross-examination affords the accused an opportunity to test the recollection and sift the conscience of the witness. Mattox v. United States, 156 U.S. 237, 242, 15 S.Ct. 337, 339, 39 L.Ed. 409, 411 (1895). It also compels the witness to stand face to face with the jury in order that it may observe him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief. Id. at 242-43, 15 S.Ct. at 339, 39 L.Ed. at 411.
The United States Supreme Court has long recognized that the truth finding function of the Confrontation Clause "is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross-examination." Lee v. Illinois, 476 U.S. 530, 541, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514, 526 (1986). Such a confession is fraught with all of the dangers of inaccuracy which characterize hearsay generally. Bruton v. United States, 391 U.S. 123, 141, 88 S.Ct. 1620, 1630, 20 L.Ed.2d 476, 488 (1968) (White, J., dissenting). The out-of-court statements of a codefendant "have traditionally been viewed with special suspicion." Id. at 141, 88 S.Ct. at 1631, 20 *304 L.Ed.2d at 488. Not only are such incriminations devastating to the defendant, but their credibility is inevitably suspect. Id. at 136, 88 S.Ct. at 1628, 20 L.Ed.2d at 485. "Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence." Id. at 141, 88 S.Ct. at 1631, 20 L.Ed.2d at 488 (White, J., dissenting). The unreliability of such evidence is intolerably compounded when the alleged accomplice does not testify and cannot be tested by cross-examination. Id. at 136, 88 S.Ct. at 1628, 20 L.Ed.2d at 485. "It was against such threats to a fair trial that the Confrontation Clause was directed." Ibid. The rule is thus well settled that a codefendant's untested statement inculpating the defendant may not be introduced against the accused. Lee v. Illinois, 476 U.S. at 546, 106 S.Ct. at 2065, 90 L.Ed.2d at 530. Moreover, in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 the Court observed that, because of the devastating prejudice inherent in the introduction of such evidence, an instruction that one defendant's confession containing inculpatory references to another had evidential value solely against the confessing defendant did not sufficiently safeguard the other defendant's right to a fair trial. Id. at 126, 88 S.Ct. at 1622, 20 L.Ed.2d at 479.
Our Supreme Court has taken a parallel course in protecting the defendant's right to confrontation under New Jersey's common law. See State v. Maristany, 133 N.J. 299, 309, 627 A.2d 1066 (1993); State v. Manning, 82 N.J. 417, 421-22, 413 A.2d 605 (1980); State v. Young, 46 N.J. 152, 156-57, 215 A.2d 352 (1965); State v. Colon, 246 N.J. Super. 608, 612, 588 A.2d 440 (App.Div. 1991); cf. State v. Gross, 121 N.J. 1, 11, 577 A.2d 806 (1990). Indeed, it can fairly be said that the Court has been more protective of the defendant's right to cross-examine than its federal counterpart. Several years before the United States Supreme Court's pronouncement in Bruton, our Court held that an out-of-court confession of one defendant could not be used against the other and that a limiting instruction would not suffice to eradicate the potential for prejudice as to the non-confessing *305 defendant. State v. Young, 46 N.J. at 157, 215 A.2d 352. More recently, the Court refused to follow the course taken by the United States Supreme Court and carve out an exception to this rule in cases of "interlocking confessions." Compare Parker v. Randolph, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979) with State v. Haskell, 100 N.J. 469, 478-79, 495 A.2d 1341 (1985). Our Court's decision foreshadowed the United States Supreme Court's subsequent change in which it rejected the exception it had created earlier. Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987).
Admission of Lieutenant Sample's testimony relating to Vincent's statement incriminating the defendant clearly violated Laboy's right of confrontation under the Federal Constitution and New Jersey's common law. Vincent's declaration that defendant was primarily at fault constituted rank hearsay, carrying no guaranty of testimonial trustworthiness.
We find no merit in the State's claim that Vincent's declaration was not offered to prove the truth of its contents, but instead was introduced merely to show what prompted defendant to confess. See Evid.R. 63 (now N.J.R.E. 801(c) and 802). This contention is largely disingenuous. The voluntariness of defendant's confession was not seriously contested at trial. Moreover, this is not a case in which a defendant who is subjected to custodial interrogation suddenly changes a prior exculpatory account when faced with damning evidence provided by an accomplice. From the record before us, it appears that defendant confessed immediately after being apprised of and waiving his constitutional rights. The record does not disclose that Vincent's statement had any material impact upon defendant's decision to give a confession concerning the events resulting in the victim's death. Further, Sample testified that he apprised defendant of the gist of Vincent's statement both before and after Laboy confessed. It cannot fairly be argued that Vincent's statement in any way triggered defendant's confession. In any event, the prosecutor in his summation *306 referred to Vincent's statement without any attempt to confine his remarks to the question of voluntariness.
Beyond this, the purpose for which the State introduced Sample's testimony relating to Vincent's declaration of defendant's guilt is irrelevant in view of the absence of an instruction precluding the jury from considering the evidence as proof that the statement was true. Without a sufficient limiting instruction, the testimony contained obvious hearsay consisting essentially of Vincent's assertion that defendant was primarily responsible for Pharo's death. That statement possessed all the invidious attributes of hearsay. Vincent's largely exculpatory, self-serving statement plainly lacked reliability. Its effect was to incriminate defendant without affording him the opportunity to cross-examine Vincent. See State v. Maristany, 133 N.J. at 309, 627 A.2d 1066.
Lest we be misunderstood, we hasten to add our view that a limiting instruction would not have sufficed to eradicate the prejudice emanating from admission of Vincent's statement. In reaching this conclusion, we recognize that a codefendant's or accomplice's out-of-court statement may be introduced for a purpose other than proving the truth of what it asserts without violating a defendant's right of confrontation. In Tennessee v. Street, 471 U.S. 409, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985), for example, the defendant claimed that he had been coerced by the sheriff reading an accomplice's confession and directing him to say the same thing. The trial court allowed the State to impeach this testimony by introducing the accomplice's statement which differed from defendant's confession in material respects. A carefully worded limiting instruction was given. The Supreme Court held that "there were no alternatives that would have both assured the integrity of the trial's truth-seeking function and eliminated the risk of the jury's improper use of evidence." Id. at 415, 105 S.Ct. at 2082, 85 L.Ed.2d at 432.
In State v. Sego, 266 N.J. Super. 406, 629 A.2d 1362 (App.Div. 1993), the defendant's accomplice gave two separate statements, one admitting his own guilt and exculpating the defendant, and the *307 other placing primary responsibility on the defendant. The defense intended to introduce the statement exonerating the defendant. We upheld the trial court's decision allowing the State to discredit the accomplice's account exculpating the defendant by admitting the statement made on another occasion inculpating the defendant. Id. at 413, 629 A.2d 1362. We said that "if the State were precluded by the Confrontation Clause from using [the accomplice's] prior inconsistent statement to impeach his out-of-court statement ..., defendant would enjoy a significant strategic advantage in being able to present [only the] exculpatory [account] in hearsay form." Ibid. Under these circumstances, we were persuaded that there was a real need for admission of the accomplice's statement inculpating the defendant and we were confident that the trial court's limiting instructions would have obviated any potential for undue prejudice.
The facts here are completely different. As we noted earlier, the question of voluntariness was not seriously raised at trial and there was no sound reason requiring the admission of Vincent's declaration incriminating the defendant. This evidence had little, if any, probative value and its capacity for undue prejudice cannot seriously be questioned. Evid.R. 4 (now N.J.R.E. 403). It is difficult to see how the jury would give such a crucial statement limited probative effect even had a limiting instruction been given. See State v. Manning, 82 N.J. at 422, 413 A.2d 605. The rule that juries are presumed to follow the court's instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that "it represents a reasonable practical accommodation of the interests of the [S]tate and the defendant in the criminal justice process." Richardson v. Marsh, 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176, 188 (1987). On the precise facts before us, we find the accommodation inadequate. The evidence was not relevant to any material issue and there was no need to test the validity of the thesis that juries generally follow instructions.
*308 We also conclude that Sample's description of defendant's interaction with Vincent when they were jointly interviewed had the potential for prejudicing Laboy's right to a fair trial.[3] We believe that the trial court should have redacted Vincent's part of the conversation. See State v. Young, 46 N.J. at 157-58, 215 A.2d 352. On the record before us, it appears that the conversation could have been edited without destroying the contextual setting in which defendant's statement was made.[4]See State v. Bankston, 63 N.J. 263, 307 A.2d 65 (1973).
We cannot fairly say that these errors were harmless beyond a reasonable doubt. See Brown v. United States, 411 U.S. 223, 231-32, 93 S.Ct. 1565, 1570-71, 36 L.Ed.2d 208, 215 (1973); Schneble v. Florida, 405 U.S. 427, 430-32, 92 S.Ct. 1056, 1059-60, 31 L.Ed.2d 340, 344-45 (1972); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). While Vincent's statement fell far short of the type of comprehensive and detailed confession made by defendant, it nevertheless undermined Laboy's claim that he did not intend to kill the victim and that he did not administer the fatal blow. Although defendant recounted the commission of the crime in minute and grisly detail, the jury could have believed that he was attempting to minimize his involvement *309 because it had heard testimony that Vincent at least initially blamed him for the killing. We stress that the factual question before the jury was not whether defendant participated in the fatal attack upon the victim. Instead, the question related to the nature and extent of his involvement. The jury's inquiry required it to focus on the defendant's conduct and state of mind. See State v. Bielkiewicz, 267 N.J. Super. 520, 528-29, 632 A.2d 277 (App.Div. 1993) (quoting State v. Bridges, 254 N.J. Super. 541, 562-66, 604 A.2d 131 (App.Div. 1992), aff'd in part, rev'd in part, 133 N.J. 447, 628 A.2d 270 (1993)). The prosecution contended that defendant either himself inflicted the fatal blow while harboring the requisite culpability state for murder or that he purposely caused death through the instrumentality of his accomplice. The minds of an average jury might well have found the State's case significantly less persuasive had the testimony relating to Vincent's statement been excluded. We observe in that respect that this was defendant's second trial. At the first trial, Vincent's statement was admitted but the trial court gave a limiting instruction. The trial was aborted when the jury could not reach a verdict. There is thus the strong probability that the erroneously admitted evidence coupled with the lack of a limiting instruction tipped the scale against the defendant. That probability undermines our confidence in the jury's verdict. We conclude that the errors committed had the clear capacity to lead to an unjust result.

III.
We now turn to the trial court's instructions. Initially, we note that the court's charge did not contain any reference to defendant's custodial statement. In State v. Hampton, 61 N.J. 250, 294 A.2d 23 (1972), our Supreme Court held that the jury must be apprised of its duty to "decide whether in view of all [of the] circumstances the defendant's confession is true." Id. at 272, 294 A.2d 23. So too, the jury is to be told that "[i]f [it] find[s] that it is not true, then [it] must treat it as inadmissible and disregard it for purposes of discharging [its] function as [the] fact finder[] *310 on the ultimate issue of guilt or innocence." Ibid. This principle was encompassed in Evid.R. 8(3) which mandated that the trial court "shall instruct the jury that [it is] to disregard the statement if [it] find[s] that it is not credible." It now appears in N.J.R.E. 104(c).
The trial court clearly erred by failing to instruct the jury in accordance with State v. Hampton, 61 N.J. 250, 294 A.2d 23, and Evid.R. 8(3). The mandate in Hampton and the directive in the Rules of Evidence are designed to "insure to a defendant an unfettered factual consideration by the jury of the credibility" of all or part of his confession. State v. Boyle, 198 N.J. Super. 64, 74, 486 A.2d 852 (App.Div. 1984) (quoting State v. Bowman, 165 N.J. Super. 531, 537, 398 A.2d 908 (App.Div. 1979)). Nothing in the charge, taken as a whole, can be viewed as ameliorating this error. State v. Nutter, 258 N.J. Super. 41, 59-60, 609 A.2d 65 (App.Div. 1992); but see State v. Setzer, 268 N.J. Super. 553, 561-564, 634 A.2d 127, 131-133 (App.Div. 1993) (charge as a whole did not constitute plain error notwithstanding omission of Hampton instruction). Specifically, the trial court's general instructions on the question of credibility were not sufficient to apprise the jury of its constitutional duty under Hampton.
Defendant points to other errors in the trial court's charge. The jury was not apprised of its duty to determine whether the State presented "independent proof of facts and circumstances which strengthen[ed] or bolster[ed] the confession and tend[ed] to generate a belief in its trustworthiness." State v. DiFrisco, 118 N.J. 253, 273, 571 A.2d 914 (1990) (quoting State v. Lucas, 30 N.J. 37, 56, 152 A.2d 50 (1959)). Nor did the trial court tell the jury it was to "`receive, weigh and consider [Hernandez's testimony relating to defendant's oral admissions] with caution,' in view of the generally recognized risk of inaccuracy and ... misconstruction by the hearer." State v. Kociolek, 23 N.J. 400, 421, 129 A.2d 417 (1957).
Having said this, we note that defendant did not submit a request to charge these principles and failed to interpose a timely objection raising these points. Viewed in isolation, each of these *311 errors would not have the capacity to lead to an unjust result. See R. 2:10-2. It is at least arguable, however, that "in their aggregate [they] rendered the trial unfair," State v. Orecchio, 16 N.J. 125, 129, 106 A.2d 541 (1954), and "affect[ed] [the] substantial rights of the defendant," State v. Macon, 57 N.J. 325, 337, 273 A.2d 1 (1971). In light of our disposition of defendant's first point, we need not decide the issue. We merely note these errors to insure that they will not be repeated at the retrial.

IV.
We need not consider defendant's remaining arguments. We merely note that the trial court did not have the benefit of State v. Mann, 132 N.J. 410, 625 A.2d 1102 (1993) when it admitted evidence of defendant's threat of suicide and subsequent escape from custody. In a similar vein, our opinion in State v. Bielkiewicz, 267 N.J. Super. 520, 632 A.2d 277, which pertains to accomplice liability, was rendered after defendant's trial and convictions. These questions should be reconsidered at the retrial.
The judgment of convictions is reversed and the matter is remanded for a new trial.
NOTES
[1] Defendant was 15 years old at the time the offense was committed. His codefendant, Matthew Vincent, was also a minor. On motion of the prosecutor, the Family Part waived jurisdiction and defendant and Vincent were tried as adults. Vincent's case was severed. See N.J.S.A. 2A:4A-26. He ultimately pleaded guilty to aggravated manslaughter and conspiracy to commit aggravated assault. On the aggravated manslaughter conviction, Vincent was sentenced to a 30 year custodial term with a 15 year parole disqualifier. A concurrent 10 year sentence with a five year period of parole ineligibility was imposed on the conspiracy count.
[2] The conviction for conspiracy to commit murder should have been merged with the conviction for the substantive crime of murder. See State v. Hardison, 99 N.J. 379, 492 A.2d 1009 (1985); N.J.S.A. 2C:1-8a(2).
[3] In its brief, the State asserts that Vincent's side of the conversation was admissible as substantive evidence under the adoptive admission exception to the hearsay rule. See Evid.R. 63(8)(b) (now N.J.R.E. 803(b)(2)). This argument was not advanced in the Law Division and we decline to consider it here.
[4] Of course we do not foreclose the defendant from introducing evidence relating to Vincent's declarations against penal interest. We recognize that defendant may be compelled to adopt this course in order to ameliorate the damaging effect of his own incriminatory statements. That the defendant may face such a dilemma does not constitute an invasion of his rights. The criminal process, like the rest of the legal system, "is replete with situations requiring `the making of difficult judgments' as to which course to follow." McGautha v. California, 402 U.S. 183, 213, 91 S.Ct. 1454, 1470, 28 L.Ed.2d 711, 729 (1971) (quoting McMann v. Richardson, 397 U.S. 759, 769, 90 S.Ct. 1441, 1448, 25 L.Ed.2d 763, 772 (1970)). Although a defendant may have a right to follow whichever course he adopts, "the Constitution does not by that token always forbid requiring him to choose." Ibid.