285 N.J. Super. 589 (1995)
667 A.2d 1094
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
REGINALD JORDAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 11, 1995.
Decided December 14, 1995.
*591 Before Judges PRESSLER, WEFING and A.A. RODRIGUEZ.
*592 Frank J. Pugliese, Assistant Deputy Public Defender, argued the cause for appellant (Susan L. Reisner, Public Defender, attorney; Mr. Pugliese, of counsel and on the brief).
Linda K. Danielson, Deputy Attorney General, argued the cause for respondent (Deborah T. Poritz, Attorney General, attorney; Ms. Danielson, of counsel and on the brief).
The opinion of the court was delivered by WEFING, J.A.D.
Defendant was indicted and convicted for knowing and purposeful murder (N.J.S.A. 2C:11-3a(1), (2)); attempted murder (N.J.S.A. 2C:5-1; 2C:11-3); robbery in the first degree (N.J.S.A. 2C:15-1); and possession of a weapon for an unlawful purpose (N.J.S.A. 2C:39-4a).
The trial court sentenced him to life in prison, with a thirty-year parole bar, for the murder conviction. The trial court imposed concurrent terms for the remaining convictions: twenty years, with a ten-year parole bar, for attempted murder; twenty years, with a ten-year parole bar, for first degree robbery; and ten years, with a five-year parole bar for possession of a weapon for an unlawful purpose.
The State presented evidence in support of the following scenario. Defendant, together with Joseph Thomas and Ken Dunlap, participated in an armed robbery of Calvin Lattany in the early morning hours of October 27, 1991 in New Brunswick. The incident occurred at 176 Memorial Parkway, a multi-unit apartment complex referred to throughout the trial as "the projects." Lattany was speaking to a friend, Johnnie Lambert, when Thomas and Dunlap approached him and asked if he wanted to purchase drugs. When Lattany responded affirmatively, Thomas and Dunlap went off in apparent search of drugs. Their plan, however, was not to sell drugs to Lattany but to use the drugs as a ploy so that Lattany would take out his money and they could then rob him.
*593 Thomas and Dunlap approached defendant and outlined their scheme. He told the two he had several bags of heroin and agreed to participate. He also told them he knew the location of a gun. In his statement to the police, defendant merely said he knew there was a gun in a nearby garbage can and that he retrieved it. Dunlap testified that Jordan said the gun was his and that Jordan went over to a nearby car, reached underneath, and returned with the gun. The three went back to Lattany to complete their plot. It went awry, however, because Lattany resisted handing over his money. A struggle ensued, Jordan's gun discharged and Joseph Thomas, one of the plotters, was killed. Thomas was standing right behind Lattany who testified that he ducked just as the gun was fired and, as a result, the bullet struck Thomas.
The police investigation ultimately led to Jordan. He was arrested and interrogated. After waiving his Miranda rights (Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)), defendant gave two statements to the police: one oral in which he allegedly said he had aimed at Lattany, who ducked just as he fired the gun, and another, taped, in which he asserted that in the struggle, Lattany had struck the pistol causing it to discharge. This second version is, of course, inconsistent with knowing and purposeful murder.
On appeal, defendant raises six arguments:
POINT I THE TRIAL JUDGE COMMITTED REVERSIBLE ERROR WHEN HE FAILED TO CHARGE THE JURORS THAT THEY MUST DETERMINE THE CREDIBILITY OF DEFENDANTS OUT-OF-COURT STATEMENTS, FAILED TO ADVISE THEM THAT THEY MUST FIND SUCH STATEMENTS TO BE CREDIBLE BEYOND A REASONABLE DOUBT AND FAILED TO ADVISE THEM THAT SUCH STATEMENTS MUST BE CORROBORATED BEFORE THEY COULD BE CONSIDERED AS EVIDENCE. (Not raised below)
POINT II THE COURT ERRED IN FAILING TO INSTRUCT THE JURY REGARDING THE UNRELIABLE NATURE OF TESTIMONY ATTESTING TO ORAL STATEMENTS MADE BY THE DEFENDANT. (Not raised below)
POINT III THE TRIAL COURT'S REFUSAL TO ALLOW DEFENDANT TO PRESENT EVIDENCE WHICH SUPPORTED THE THEORY OF THE *594 DEFENSE VIOLATED DEFENDANTS RIGHT TO PRESENT A DEFENSE AND HIS DUE PROCESS RIGHT TO A FAIR TRIAL BY A JURY. (U.S. CONST. AMENDS VI, XIV; N.J. CONST. ART. I, PAR. 1, 10.)
POINT IV AS TO COUNT ONE (KNOWING AND PURPOSEFUL MURDER), THE JUDGE'S CHARGE ON FLIGHT WAS ERRONEOUS AND DEPRIVED DEFENDANT OF A FAIR TRIAL ON THAT COUNT.
POINT V THE CUMULATIVE EFFECT OF THESE ERRORS DENIED DEFENDANT HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND A NEW TRIAL IS IN ORDER. (Not raised below)
POINT VI THE SENTENCE IMPOSED IN THIS CASE IS MANIFESTLY EXCESSIVE.

I.
The record is clear in this matter that defendant did not request, and the trial court did not give, an instruction to the jury in accordance with State v. Hampton, 61 N.J. 250, 294 A.2d 23 (1972), that it was part of the jury's duty to determine the credibility of Jordan's out-of-court statements to the police. See, also, N.J.R.E. 104(c). Defendant must thus demonstrate that the omission of this provision from the trial court's instructions was "clearly capable of producing an unjust result." R. 2:10-2.
We are troubled by the apparent frequency with which trial courts are omitting this fundamental principle from their instructions. See, e.g., State v. Laboy, 270 N.J. Super., 296, 637 A.2d 184 (App.Div. 1994); State v. Setzer, 268 N.J. Super. 553, 634 A.2d 127 (App.Div. 1993), certif. denied 135 N.J. 468, 640 A.2d 850 (1994).
In Setzer, defendant was convicted of aggravated arson. A part of the prosecution's case was defendant's oral statement, which was neither taped or written, following waiver of his Miranda rights. This court, after carefully reviewing the trial court's charge as a whole, State v. Wilbely, 63 N.J. 420, 422, 307 A.2d 608 (1973) concluded that the "trial court's omission of the Hampton instruction in this instance was ... not `clearly capable of producing an unjust result.'" State v. Setzer, supra, 268 N.J. Super. at 565, 634 A.2d 127 (quoting R. 2:10-2).
In State v. Laboy, supra, defendant appealed following his convictions for murder and conspiracy to commit murder. After *595 waiving his Miranda rights, defendant gave both an oral and a tape-recorded statement which recounted in detail his participation in the slaying. Again, the trial court, with no objection, failed to instruct the jury in accordance with State v. Hampton, supra. The trial court in Laboy also did not tell the jury to determine whether there was "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness," State v. DiFrisco, 118 N.J. 253, 273, 571 A.2d 914 (1990), nor did it refer to "the generally recognized risk of inaccuracy and ... misconstruction by the hearer" of oral admissions. State v. Kociolek, 23 N.J. 400, 421, 129 A.2d 417 (1957). Laboy is thus closely analogous to the instant matter since the trial court here made similar omissions.
In Laboy, we did not conclude that any one of these failures amounted to plain error. Defendant's conviction in that case was reversed on other grounds and we merely noted in dicta that the combination of those three omissions may have called for a reversal under State v. Orecchio, 16 N.J. 125, 106 A.2d 541 (1954). We specifically declined, however, to so hold.
We are satisfied, however, after a careful review of the record, that failure of the trial court to inform the jury in accordance with State v. Hampton, supra, does not, in the context of this matter, constitute plain error. Defendant did not deny that he killed Joseph Thomas. His defense centered around his contention that the shooting was accidental, the result of Lattany having struck the gun by accident during the struggle. That assertion was clearly set forth in defendant's tape-recorded statement. His prior oral statement, however, as recounted by Detectives Selesky and Clark, set forth a somewhat different rendition for in that defendant admitted firing at Lattany who escaped by ducking. The jury had to know and understand that they would have to decide which of these versions was credible. The matter is thus in sharp contrast to situations in which a defendant at trial denies either the act or the confession or both.
*596 Defendant's attorney clearly outlined this choice to the jury in his summation, strongly arguing to the jury that defendant never made the unrecorded oral confession that the officers testified about. He pointed to things within the record to support that argument. The jury, by its verdict, clearly rejected that position. We consider the jury's verdict a clear statement that it did not consider credible defendant's tape-recorded version of what occurred.

II.
We reach the same result, for essentially the same reason, on defendant's second argument, that the trial court committed plain error when it did not include in its final remarks to the jurors that the jury should consider evidence of the alleged oral statement "`with caution' in view of the generally recognized risk of inaccuracy and error in communication and recollection of verbal utterances and misconstruction by the hearer." State v. Kociolek, 23 N.J. 400, 421, 129 A.2d 417 (1957).
Such an instruction, if requested, should be given. Ibid.; State v. Kennedy, 135 N.J. Super. 513, 522, 343 A.2d 783 (App.Div. 1975); State v. Travers, 70 N.J. Super. 32, 38, 174 A.2d 747 (App.Div. 1961). Defendant has not identified a reported case in which a failure to include these principles within a trial court's final charge has been held plain error. Neither has our research disclosed such a case.
Nor do we see any error in the trial court not telling the jury that it should determine whether the alleged oral confession was corroborated by other evidence. Defendant relied on his tape-recorded statement, for which there was no corroboration. Clearly the trial court could not tell the jury it had to consider whether the oral statement was corroborated but need not consider whether the tape-recorded statement was corroborated.
In light of the clear testimony of Lattany and Dunlap about the night's events, we reject defendant's contention that his alleged oral statement was "critical" to the State's case. What was critical *597 to the State's case was whether the jury accepted the testimony of Lattany and Dunlap for the credibility of both was subject to serious challenge.
Lattany's testimony at trial differed from his statement to the police in one regard, for when he initially approached the police, some hours after the incident, he denied he had had any intention to purchase drugs. He explained that discrepancy to the jury and they were free to accept or reject his explanation.
Dunlap had, prior to defendant's trial, negotiated a plea bargain for himself under which he pled guilty to robbery and agreed to testify at defendant's trial. In return, the State agreed to dismiss all remaining charges against him, which included murder, and to recommend a sentence of time served. Dunlap was cross-examined on the issue and defense counsel attacked his credibility in his summation.
Both of these individuals, moreover, had criminal convictions which were admitted for the jury's consideration on their credibility.[1] With all of those elements weighing against the credibility of Lattany and Dunlap, the jury accepted their testimony nonetheless.

III.
Lattany testified that just prior to his initial encounter with Dunlap and Thomas, he had been talking with Johnnie Lambert, a close family friend. Defendant sought to introduce, through Lambert, that Lambert had warned Lattany that Thomas was a "stick-up man." The trial court refused to permit defendant to introduce *598 that evidence, saying it was an attack upon the character of the deceased.
We reject defendant's contention that this trial court ruling constituted reversible error. The admission of evidence at trial and the determination of whether that proffered evidence is relevant rests in the sound discretion of the trial court. State v. Catlow, 206 N.J.Super, 186, 193, 502 A.2d 48 (App.Div. 1985), certif. denied 103 N.J. 465, 466, 511 A.2d 648 (1986). We do not perceive that the trial court in any way abused its discretion in refusing to permit defendant to offer this testimony; that Lattany may have been forewarned about Thomas does not establish that he was more likely to strike out at defendant and thus cause defendant's gun to discharge.

IV.
At the time of this incident, defendant resided with one of his sisters in one of the apartment buildings at the site of the homicide. Defendant was arrested the following day at the home of another sister in Franklin Township. The State requested the trial court to include the concept of "flight" within its final instructions. Defense counsel objected and the trial court did not make an immediate ruling on the issue. It did, however, include the concept within its final instructions. Defendant now argues that that decision was reversible error. He does not contend that it was error not to inform defense counsel of his decision on the issue prior to summation.
We have long held that evidence of flight is generally admissible as demonstrating consciousness of guilt, State v. Mann, 132 N.J. 410, 418, 625 A.2d 1102 (1993). Our cases have also recognized that mere departure is not equivalent with flight. "For departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt." State v. Sullivan, 43 *599 N.J. 209, 238-39, 203 A.2d 177 (1964), cert. denied 382 U.S. 990, 86 S.Ct. 564, 15 L.Ed.2d 477 (1966).
Defendant contends that since his departure was explainable (he did not wish to face charges of first degree robbery), it did not constitute flight. He also contends that, at the very least, the trial court should have distinguished between flight as evidence of guilt of robbery and as evidence of guilt of murder. Defendant's distinctions are unavailing, however. One is no less likely to flee from a homicide than from a robbery.

V.
Finally, we consider defendant's last two contentions, that his convictions should be reversed under the doctrine of cumulative error State v. Orecchio, 16 N.J. 125, 106 A.2d 541 (1954) and that his sentence is manifestly excessive to be without merit. R. 2:11-3(e)(2). We merely add the following comments with regard to his sentence.
The law is well settled that we will not reduce a defendant's sentence absent a finding of clear abuse of judicial discretion. State v. Roth, 95 N.J. 334, 363, 471 A.2d 370 (1984). A reviewing court will only modify a defendant's sentence if "the application of facts to the law is such a clear error of judgment that it shocks the judicial conscience." Id. at 364, 471 A.2d 370. "The test, then, is not whether the reviewing court would have reached a different conclusion on what an appropriate sentence should be; it is rather whether, on the basis of the evidence, no reasonable sentencing court could have imposed the sentence under review." State v. Ghertler, 114 N.J. 383, 388, 555 A.2d 553 (1989).
It is not without significance that defendant's trial counsel was unable to point to a single mitigating factor at the time of sentence. Defendant had an extensive prior record and, indeed, *600 had been out of jail only three days prior to this incident. We decline to modify defendant's sentence in any respect.
Defendant's convictions and sentence are affirmed.
PRESSLER, P.J.A.D., dissenting.
I respectfully dissent. In my view, the absence of a Hampton[1] charge and the absence of a Kociolek[2] charge both individually and in the aggregate deprived defendant of a fair trial and, therefore, constituted plain error. I would therefore reverse and remand.
As I view the record, the only real question the jury had to decide was whether defendant's killing of the victim constituted purposeful and knowing murder or some less culpable degree of homicide. The State's factual theory of purposeful and knowing murder was predicated on defendant's asserted intention of shooting the intended victim, Lattany. Lattany escaped that fate by ducking, with the result that the bullet hit the actual victim, one of defendant's accomplices in the attempted robbery, who had been standing immediately behind Lattany. Defendant's defense to purposeful and knowing murder was based on his concession that he and his two accomplices were attempting to rob Lattany, that he, defendant, was pointing a gun in Lattany's direction in aid of the robbery, and that Lattany struck the gun, causing it "accidentally" to discharge and kill the victim. If defendant's version were believed, the jury would have had the option of convicting him of aggravated manslaughter or reckless manslaughter. Conceivably, it could also have found the killing to be accidental.
It is in the light of the significance of these disparate versions of the killing that the two statements given by defendant following his arrest, both of which were admitted into evidence, must be considered. The shooting took place during the early morning *601 hours of October 27, 1991. The police investigation led to defendant, who was arrested at his sister's home in the early evening of that day. He was brought to police headquarters in New Brunswick where the crime had taken place. It was there that he confessed to two of the investigating officers, a Middlesex County prosecutor's detective and a New Brunswick detective.
Prior to making any statement at all, defendant acknowledged in writing that he had been advised of his Miranda[3] rights. That document, introduced into evidence, shows that it was signed at 8:52 p.m. According to the police testimony, defendant began at that time to give an oral statement in which he confessed that he and his two accomplices were attempting to rob Lattany and that he, defendant, had had the gun. The actual recounting by one of the officers of what defendant said was prefaced by this comment:
Well, because of the things that we were told during the day, we realized that the shooter, Mr. Jordan, during the hold-up, had, at one point, put the gun directly in front of Lattany's face. And, at that point, Lattany ducked and the gun was fired, and Joey Thomas was shot and killed.
This direct examination then ensued:
Q Once you began speaking with the defendant like this, what, if anything, did he tell you?
A Basically, he, basically, said that he was going to  He, Sabir, and Dunlap were going to rob a guy. The guy ducked. The gun went off. And Sabir was shot.
Q Is this when you first spoke to him?
A Yes, sir.
Q He said the guy ducked?
A I think he said the guy moved. The guy moved.
Q That is referring to Calvin Lattany?
A Yes, sir.
Q And the gun went off?
A Yes, sir.
Q That's how Sabir [Thomas] was shot?
A Yes. Sabir.
Q Did he say anything to you initially about anyone wrestling with him?

*602 A No, sir.
Q Did he say anything initially about anybody striking the gun?
A No.
In any event, after defendant had concluded this alleged oral statement, the two officers left him to discuss the next step with their superiors. The officers were instructed to obtain a recorded statement from defendant, which they in fact did. The transcript of the recorded statement shows that it commenced at 9:02 p.m., just ten minutes after the Miranda card was signed. In this statement, defendant claimed that the gun went off because Lattany had struck it as the two accomplices were trying to rifle his pockets. He also denied that he had known the victim prior to the attempted robbery.
The State's strategy was to emphasize the discrepancy between the two statements, not only by way of the testimony of the two police officers, but also by way of the prosecutor's statements to the jury. Thus, in his closing remarks, the prosecutor had this to say:
The Detectives looked at each other. They knew they had gotten a confession. They went out and told their superiors outside. They get back in to get him on tape. But, in the interim, Reginald Jordan, obviously, was thinking, maybe I really shouldn't have said that.
It might not be so good for him. He began to clean himself up a little bit. Then he gave a statement, a confession as [defense counsel] has called it. And I say to you, it was a confession; but it was a self-serving confession. He began to clean himself up, which is a natural tendency.
He then proceeded to argue that the exculpatory details of the recorded statement had been fabricated while the prior unrecorded statement had been truthful.
I do not doubt the prosecutor's right to make that argument in closing. The evidence, including Lattany's testimony, supported it. But by the same token, there were flaws in the argument. There was a lapse of only ten minutes between the time defendant signed the Miranda card and the time the recorded statement began. The officers conceded that the time consumed by the oral statement was very brief and that defendant had not been asked to go into any greater detail than that which he had already *603 volunteered. The police witnesses overemphasized the extent of the discrepancies. And most significantly, there may not have been much discrepancy at all beyond the question of whether defendant had known the victim. Clearly, the State's subliminal message to the jury was that defendant had acknowledged in his unrecorded oral statement that Lattany had ducked and hence, when he said that Lattany had "moved," ducking was what he actually meant. The fact, however, is that Lattany striking the gun was not necessarily inconsistent with his statement that Lattany had "moved." This is so because during the giving of the unrecorded statement, defendant was not asked, and apparently did not volunteer, just what he meant by saying that Lattany had moved.
The tack taken by defense counsel was not to minimize the discrepancy but to suggest to the jury that the oral statement had never in fact been made or, at least, not made in accordance with the tenor described by the two police officers. He established that neither officer had retained their notes of the unrecorded statement, their explanation being that once the official report is prepared the notes are destroyed. The report, which was entirely consistent with the ambiguous "Lattany moved" version, was, however, not prepared until almost seven weeks later.
From the foregoing, it is evident that the jury's assessment of the credibility of the two statements was critical to the outcome of this trial. That is, had the jury believed the accidental-discharge explanation of the recorded statement and rejected the credibility of the ducking thesis, they may have returned a verdict other than purposeful and knowing murder.
I do not know how, if this is so, the failure of a Hampton charge and of a Kociolek charge, either singly or in combination, could not have constituted plain error. The Hampton charge is codified by N.J.R.E. 104(c), formerly N.J.Evid.R. 8(c). That rule reads in full as follows:
(c) Where by virtue of any rule of law a judge is required in a criminal action to make a preliminary determination as to the admissibility of a statement by the *604 defendant, the judge shall hear and determine the question of its admissibility out of the presence of the jury. In such a hearing the rules of evidence shall apply and the burden of persuasion as to the admissibility of the statement is on the prosecution. If the judge admits the statement the jury shall not be informed of the finding that the statement is admissible but shall be instructed to disregard the statement if it finds that it is not credible. If the judge subsequently determines from all of the evidence that the statement is not admissible, the judge shall take appropriate action. (Emphasis added)
The instruction obligation imposed upon the judge by the rule is mandatory. That mandatory obligation implements the holding of Hampton, supra, 61 N.J. at 272, 294 A.2d 23 that
the jury shall be instructed that they should decide whether in view of all the same circumstances the defendant's confession is true. If they find that it is not true, then they must treat it as inadmissible and disregard it for purposes of discharging their function as fact finders on the ultimate issue of guilt or innocence.
As we explained in State v. Bowman, 165 N.J. Super. 531, 537, 398 A.2d 908 (App.Div. 1979), where a defendant's asserted confessions bear critically both on the question of guilt and degree of guilt, those confessions, especially if inconsistent with each other, deserve "the closest scrutiny before the jury could determine what portions of each statement it could deem credible beyond a reasonable doubt in determining defendant's guilt." The mandatory Hampton charge is, of course, intended to assure that scrutiny. Thus, whether or not the failure to so charge can ever be harmless error, I am convinced that it was not harmless here.
The Hampton error was exacerbated by the Kociolek error. In Kociolek, the Court held that it was error for the trial judge to have rejected defendant's request that the jury be instructed that oral unrecorded admissions should be considered with caution, "in view of the generally recognized risk of inaccuracy and error in communication and recollection of verbal utterances and misconstruction by the hearer." 23 N.J. at 421, 129 A.2d 417. As the Court explained:
There are inherent weaknesses in this character of testimony: faulty memory, the danger of error in understanding and repetition. Such are the reasons for the rule.
........

*605 There is a "general distrust of testimony reporting any extra-judicial oral statements alleged to have been made, including a party's admissions"; the "great possibilities of error in trusting to recollection-testimony of oral utterances, supposed to have been heard, have never been ignored; but an antidote is constantly given by an instruction to the jury against trusting overmuch the accuracy of such testimony"; "Verbal precision is of course important to the correct understanding of any verbal utterance, whether written or oral, because the presence or absence or change of a single word may substantially alter the true meaning of even the shortest sentence.

Kociolek, 23 N.J. at 421-422, 129 A.2d 417.
I think it plain, therefore, that had defendant requested such a charge in respect of the oral statement, he would have been entitled to it. In the circumstances here, I believe it was plain error for the charge not to have been given. From defendant's point of view, and indeed from the prosecution's as well, the critical issue was whether the oral statement, as construed by the police and the prosecutor, was truthful or whether the recorded statement was. As a matter of law, Kociolek attributes a greater degree of reliability to a contemporaneously recorded statement. Defendant was entitled to have the jury know that.
Nor do I think that the error was cured by the evidence as a whole. The State relied on the testimony of both Lattany and the surviving accomplice to put the lie to the assertions of the recorded statement. But neither was without interest. The accomplice had already made his deal with the prosecutor, an almost incredibly favorable deal subjecting him only to time served. Lattany too was in jeopardy because an essential part of his testimony was that the robbery occurred while he was trying to buy drugs from his assailants. I do not, therefore, regard the evidence of the "duck" as so overwhelming as to have rendered either of the two absent charges inconsequential.
It is true, as my colleagues point out, that in State v. Laboy, 270 N.J. Super. 296, 310-311, 637 A.2d 184 (App.Div. 1994), this court, having reversed the conviction before it on other grounds, rejected in dictum the notion that the failure of the Hampton charge is per se plain error. See also, so holding, State v. Setzer, 268 N.J. Super. 553, 565, 634 A.2d 127 (App.Div. 1993). Nevertheless, Laboy *606 expressly noted that while neither the failure of the Hampton charge nor the failure of the Kociolek charge, taken alone, there constituted plain error, they might, however, in the aggregate have combined to do so. 270 N.J. Super. at 310-311, 637 A.2d 184. I have no doubt that in this case, even if neither failure by itself were plain error, the failure of both was.
I share the concern of the majority with the apparently escalating trend of the failure by trial judges to give Hampton charges and the failure of counsel to request them. See Laboy, supra; Setzer, supra; State v. Nutter, 258 N.J. Super. 41, 59-60, 609 A.2d 65 (App.Div. 1992). I note as well that in the last several years there has been a disturbing number of unreported opinions either directly addressing or noting a Hampton charge failure. I differ, however, from those of my colleagues who have concluded that the failure is not plain error per se. While I need not deal with that question here because of what I believe to be clear circumstantial plain error, I nevertheless am constrained to express my view that the Hampton charge is founded upon essential due process considerations deriving from the recognition that while the confessions of criminal defendants constitute devastating evidence against them, they are, regrettably, not always truthful or reliable. I am loathe to see the bedrock of fundamental fairness embodied by the Hampton charge eroded by the harmless error doctrine. It is virtually axiomatic that an erroneous charge in a criminal case is a poor candidate for rehabilitation by way of the harmless error rule. See, e.g., State v. Wilson, 128 N.J. 233, 241, 607 A.2d 1289 (1992); State v. Vick, 117 N.J. 288, 289, 566 A.2d 531 (1989); State v. G.S., 278 N.J. Super. 151, 166, 650 A.2d 819 (App.Div. 1994). I would place Hampton charge failures in the category of errors not subject to such rehabilitation.
I would reverse and remand for a new trial.
NOTES
[1] We note that the trial court instructed the jury on the effect of these convictions during its final instructions to the jury. It did not separately instruct the jury at the time the witnesses testified. It is preferable that the jury know immediately of the limited purpose of such testimony. We have not been provided with the transcript of jury selection. R. 2:5-3(b). It is inferable from one portion of the record that the trial court did provide preliminary instructions to the jury on that issue.
[1] State v. Hampton, 61 N.J. 250, 294 A.2d 23 (1972).
[2] State v. Kociolek, 23 N.J. 400, 129 A.2d 417 (1957).
[3] Miranda v. Arizona, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966).