751 A.2d 123 (2000)
331 N.J. Super. 58
STATE of New Jersey, Plaintiff-Respondent,
v.
Jamie FARTHING, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted April 19, 2000.
Decided May 18, 2000.
*125 Ivelisse Torres, Public Defender, for defendant-appellant (Ruth Bove Carlucci, Assistant Deputy Public Defender, of counsel and on the brief).
John J. Farmer, Jr., Attorney General, for plaintiff-respondent (Nancy A. Hulett, Deputy Attorney General, of counsel and on the brief).
Before Judges BAIME, BROCHIN and EICHEN.
*124 The opinion of the court was delivered by BAIME, P.J.A.D.
Following a protracted jury trial, defendant was found guilty of two counts of first degree kidnaping (N.J.S.A. 2C:13-1b(1) and (2)), two counts of first degree robbery (N.J.S.A. 2C:15-1), two counts of possession of a firearm for an unlawful purpose (N.J.S.A. 2C:39-4a), two counts of possession of a handgun without a permit (N.J.S.A. 2C:39-5b), purposeful or knowing murder (N.J.S.A. 2C:11-3a(1) and (2)), and two counts of felony murder (N.J.S.A. 2C:11-3a(3)). After merging the convictions for felony murder and possession of a firearm for an unlawful purpose, the trial court sentenced defendant to an aggregate term of life imprisonment plus sixty years with a forty year parole disqualifier on the surviving counts. Defendant appeals. We reverse defendant's conviction for purposeful or knowing murder because: (1) the prosecutor elicited testimony from two investigators that defendant's non-testifying co-defendants had implicated her in the robberies and murder, (2) the trial court erroneously allowed the State to cross-examine the defense's expert witnesses using inadmissible hearsay, and (3) hearsay *126 evidence was improperly admitted under the co-conspirator exception. These errors did not affect the remaining convictions, which we affirm.

I.
Defendant, who was eighteen years old, resided in Conyers, Georgia with her father, step-mother and brother. In June 1994, defendant's father ordered her to leave the family home for disciplinary reasons. Penniless and unemployed, defendant found shelter with her boyfriend, Edward Kummer, and others. Through Kummer, defendant met Ivie Demolina and Thomas Christopher James.
Demolina had worked for an escort service in New York City. During the summer, she hatched a plan to rob several of her former clients. Over Kummer's objections, Demolina and James enlisted defendant in the scheme. The plan was for the two women to gain entry to the victims' residences by promising sexual services. The victims were to be restrained and their belongings taken.
In July 1994, defendant, James and Demolina left Georgia for New York City. At some point during the journey, Demolina placed a collect telephone call to her half-sister, Magda Rahey, who resided in Brooklyn. Demolina told Rahey she was in the company of James and defendant. During the conversation, Rahey heard two voices in the background. One was a male; the other was a female having a "thick [southern] accent." Demolina told Rahey that the three intended to "finish something off" and to "take care of something." When pressed for details, Demolina responded that she, James and defendant planned to go to New Jersey to "kill" a man. Demolina added that she might visit Rahey while in the area.
Demolina, James and defendant arrived in Brooklyn some time in August. They took up residence with Demolina's mother, Maria Rios, and her half-brother, Ben Rosario. Demolina and defendant purchased wigs which they were to wear in the planned robberies. The stage was thus set for execution of their plan.
On August 3, 1994, Demolina telephoned Robert Hippman. Calling herself "Erica," Demolina told Hippman that she and her friend "Alexis," who was also an escort, were in the area. Demolina offered to provide sexual services to Hippman in exchange for money. Hippman had met Demolina on a prior occasion when he had telephoned the L'Affaire Escort Service on December 24, 1992. Demolina had identified herself as "Erica" and the two had engaged in sexual relations. Hippman thus invited the two women to his highrise apartment in Hackensack.
At the appointed hour, Efrain Papaleo, a friend of Rosario, drove Rosario, defendant, Demolina and James to Hippman's apartment. During the ride, it was agreed that Demolina would identify herself as "Erica" and defendant would identify herself as "Alexis." Once having gained entry into Hippman's apartment, James was to brandish a firearm and restrain the victim. Papaleo and Rosario were to remain in the automobile.
At approximately 1:30 a.m., defendant and her companions arrived at Hippman's building where they were greeted by William Mooney, the doorman. Identifying herself as "Erica," Demolina explained that they were there to visit Hippman. Using the building's intercom, Hippman confirmed that "Erica" and "Alexis" were his guests.
Hippman was not happy to see that "Erica" and "Alexis" were accompanied by James. He nevertheless allowed the three to enter the apartment based upon Demolina's statement that James merely wished to use the telephone. Hippman testified that "Alexis," whom he identified in court as the defendant, suddenly pointed a dark gray or black gun at him and announced, "this is a stickup." Hippman was ordered to lie face down. When he refused, James pulled out a second gun. James then *127 taped Hippman's hands and legs so he could not move.
As Hippman lay immobilized on his stomach, defendant, Demolina and James ransacked the apartment. After placing numerous items in a sports bag, James held a gun to Hippman's back while the two women secured him with additional duct tape.
The trio left Hippman's apartment at approximately 4:00 a.m. James carried the sports bag containing the stolen items. Papaleo then drove defendant and her companions to Brooklyn. En route, they stopped at the Valley Bank in Bergenfield where James used Hippman's ATM card to withdraw money from the cash machine.
Hippman was eventually able to free himself and summon the police. The police subsequently retrieved a surveillance tape of the Valley Bank's ATM machine. The tape showed James using Hippman's ATM card. Hippman later identified James from the tape as the man who had assisted defendant and Demolina in the robbery.
The next victim was James Polites. Polites lived alone in an apartment in Edgewater. Among other business ventures, Polites was a partner with John Acunto and Francis Sposa in a bar located in Fort Lee. The practice was for Sposa to distribute cash profits in a white envelope. Polites would obtain the envelope at his leisure and give Acunto his share. In the beginning of August, Sposa gave Polites an envelope containing $5,000. Polites telephoned Acunto and told him that he would give him his share when the two next met.
Demolina was acquainted with Polites. She had met Polites and his friend, Leonard Marshall, at a nightclub in 1992. Demolina had introduced herself as "Evia." Polites and Demolina engaged in a sporadic romantic relationship that ended in 1994.
On August 4, 1994, Demolina telephoned Polites at his Fort Lee bar and told him that she and "Alexis" were in the area and wanted to engage in a menage a trois. Demolina instructed Polites to make sure he was alone and to have a bottle of Pino Grigio Santa Marguerita wine at hand. After concluding his telephone conversation with Demolina, Polites described what had occurred to Vincent Luppino, a friend who was also a patron of the bar. He also told Sposa. Later that night, Sposa answered the telephone at the bar, and a woman asked for Polites. Demolina and defendant made final arrangements with Polites to meet him at his apartment. Demolina told Polites that she and her friend charged $300 an hour for sexual activities. This call was placed from a pay telephone near Rios's apartment in Brooklyn. Polites left the bar and was never again seen alive.
Polites' death was not discovered until August 8, 1994. As we mentioned, Polites was to meet Acunto and deliver his share of the profits from the bar. Acunto attempted to reach Polites by telephone, but was unsuccessful. After getting numerous busy signals, Acunto tried contacting Polites by paging him. Ultimately, Acunto received a telephone call from James who had stolen Polites' pager. Acunto asked whether he was speaking to Polites. When James said no, Acunto hung up.
His suspicions aroused, Acunto proceeded to the Fort Lee bar but was told that Polites had not appeared. Acunto then drove to Polites' apartment where he gained entry by using a key Polites had given him. Acunto immediately noticed that the apartment had been ransacked. Fearing the worst, Acunto proceeded to the second floor where he observed Polites' ankles bound together protruding from the bedroom doorway. Entering the bedroom, Acunto saw that Polites was hanging from the doorway with his upper torso suspended and his head approximately six inches from the floor. Polites' body was positioned face down with his back arched. His hands were tied together behind his back. His head was covered by a pillow case. A cord was wrapped around his neck and tied to the door knob.
*128 The police responded immediately. They found the apartment in a state of disarray. Polites' ashen gray body was discovered in the position we have described. The officers noticed that two neckties had been used to bind Polites' ankles. The victim's wrists were tied behind his back with a telephone cord. A third necktie had been used to "hog tie" Polites' hands and ankles. The victim's thighs were also tied with a necktie. A pillow case had been placed over Polites' head and was secured with a necktie. Blood stains appeared on the pillow case and carpet. An electrical cord was tied around Polites' neck and tied to the bedroom doorknob.
An autopsy disclosed a laceration on the back of Polites' head, consistent with having been made by a small blunt object. The medical examiner, Dr. Sunandan Singh, concluded that the blow was not sufficient to render the victim unconscious. There was a single ligature mark on Polites' neck which was also imprinted on the outer surface of his esophagus. In Singh's opinion, the cause of death was asphyxia due to a single fracture of the left superior horn of the hyoid cartilage. Since Polites was a young person whose cartilage was strong and elastic, Singh theorized that a great deal of force had been applied. Singh concluded that the killer had straddled the victim's body from behind and pulled the tie surrounding Polites' neck with great pressure. There was no sign that Polites had struggled. Death occurred within three minutes.
The State presented overwhelming evidence connecting defendant to the crimes. On August 5, 1994, the day Polites' body was discovered, Demolina, James and defendant went to a pawn shop in Brooklyn where they traded in a Super Bowl ring they had taken from the victim's apartment. Thomas Delgado, the proprietor of the store, was acquainted with Demolina, and was able to provide the police with a detailed description of James and defendant. Delgado accepted the Super Bowl ring in exchange for various items of jewelry. Defendant purchased what Delgado described as a motion ring.
Several days after the killing, Demolina placed a collect telephone call to Magda Rahey. In guarded language, Demolina confided that she had "finished" her dealings in New Jersey and was leaving for an unspecified destination with defendant and James. Initially, Demolina noted that "she had to rough [the victim] up" and "beat" him. When pressed by Rahey, Demolina told her that she had "finished him off."
Beginning on August 6, 1994, defendant and her companions checked into a series of expensive Manhattan hotels, paying their bills and other charges with cash. The trio brazenly registered under the name "Farthing," using "Conyers, Georgia" as their home address. On one occasion, the room was registered in defendant's name and the address was that of her father. While staying at one hotel, defendant and Demolina had a photograph taken of them wearing the wigs they had used in the Hippman robbery.
Subsequently, defendant parted company with Demolina and James and flew to Georgia for a one week visit. Kummer met defendant at the airport and noticed that her luggage was very heavy and that she was wearing the motion ring she had purchased from Delgado's pawn shop. Kummer drove defendant to her mother's house in Union City, Georgia. While helping defendant unpack, Kummer found a plethora of items defendant claimed she had purchased in New York. At the end of the week, defendant returned to New York using the return of a round trip ticket.
Upon her return, defendant and her companions checked into the Mayflower Hotel on Central Park West in Manhattan. Kummer ultimately flew to New York and joined them. During Kummer's stay, defendant, Demolina and James lived lavishly. James paid "for almost everything" *129 with a "stack of money" consisting of thousands of dollars. Kummer asked defendant about the source of the money, which was spent on clothes, jewelry, camcorders and crystal. Defendant explained that they had robbed a man by entering his house while pretending to be prostitutes. Defendant told Kummer that James had killed the man. Appalled by defendant's story, Kummer asked how she could have participated in such a scheme. Defendant replied that it was "an easy way to get things," although she claimed that she did not know in advance that James intended to kill the victim.
Before leaving New York, Kummer urged defendant to return with him to Georgia, offering to pay for her flight. Defendant declined Kummer's invitation, emphasizing that she could leave whenever she wished. Kummer returned to Georgia without defendant.
On August 28, 1994, defendant, James and Demolina checked out of the Mayflower Hotel. They arrived at the Brooklyn apartment of defendant's half-sister, Magda Rahey, with four pieces of luggage. Rahey was about to move to another apartment and had stored her household items in a warehouse. James, with Rahey's help, rented a larger storage bin at the same facility. This proved to be a brief interlude. Defendant, Demolina and James checked into the Iroquois Hotel in Manhattan, where they continued to spend money lavishly. Ultimately, they "ran out of money," and defendant returned to Georgia where she resided with her mother.
Detective Robert Hynes, who was investigating the Hippman robbery, happened upon a newspaper article describing the Polites homicide investigation. Hynes joined Bergen County Investigators Terrance Alver and Frank Kelaher, who were investigating the Polites killing. Kelaher traced the telephone numbers Hippman had provided regarding the calls that had been made to him by "Erica." The telephone numbers were traced to a pay telephone booth near Maria Rios's Brooklyn apartment. A third telephone call had been made to Hippman from Rios's residence. The investigators learned that Demolina occasionally resided at her mother's apartment. They obtained her photograph from the New York City police. Hippman subsequently identified Demolina as one of the perpetrators of the robbery. Marshall also identified Demolina as Polites' former girlfriend.
With the aid of the New York City police, Demolina and James were apprehended as they were checking out of the Cross Bay Motel in Queens. A search of their luggage revealed a .34 caliber H & R revolver and a .38 caliber Rossi revolver. The police additionally recovered many of the items that had been stolen from Hippman's apartment. An undeveloped film depicted defendant, Demolina, James, Papaleo and Rosario. Papaleo and Rosario were subsequently arrested and additional articles belonging to Hippman were seized.
Demolina and James gave statements to the police implicating defendant. Based upon those statements, Detective Hynes and Investigator Alver flew to Georgia to arrest defendant. However, Demolina telephoned Kummer and warned him that the police were attempting to locate defendant. Kummer relayed this message to defendant who was apprehended as she was about to flee. A search of defendant's bedroom disclosed various articles that had been stolen from Hippman and Polites.
After waiving her constitutional rights, defendant gave an oral statement admitting that she had participated in the two robberies. However, she minimized her involvement. She claimed that she was unaware of Demolina's plan to rob former clients until she arrived in Brooklyn. While staying at Rios's apartment, Demolina told defendant she knew "coke heads" with money who deserved to get "ripped off." Defendant admitted to the police that she agreed to the plan. Demolina told defendant they would gain entry to *130 the apartment of her former clients by promising to engage in sexual relations. Pursuant to that scheme, defendant was present when Demolina telephoned Hippman from a pay booth near Rios's apartment.
Defendant described how she, Demolina and James robbed Hippman while Papaleo waited in his car. According to defendant, Demolina gave her a gun which she pointed at Hippman. After taping the victim to a chair, the trio returned to Brooklyn in Papaleo's automobile. They then took a taxi to Manhattan where they stayed in various luxury hotels.
Defendant also admitted that she participated in the Polites' robbery. However, she again minimized her involvement. Specifically, she claimed that she did not know Polites was going to be killed until she overheard Demolina tell James in Polites' apartment that he had to be eliminated because he could identify her. She claimed that this conversation between Demolina and James took place in Polites' bedroom and that she was downstairs when she overheard it. Defendant told the police that Papaleo drove Demolina, James and her to Polites' apartment. After gaining entry, Demolina asked Polites to pay the cab driver. Polites went downstairs. Several minutes later, he returned with his hands in the air. Defendant saw James walking behind Polites brandishing a gun. Defendant explained that she and Demolina went upstairs and started rummaging through Polites' belongings. James called to them to find something he could use to tie Polites' hands and feet. Demolina found some neckties and a pillow case.
While searching Polites' bedroom, defendant found the victim's Super Bowl ring and substantial amounts of cash. At some point, Demolina went downstairs and helped James carry Polites upstairs to the bedroom. Defendant observed that Polites' hands, legs and ankles were bound with neckties and telephone cord. According to defendant's oral statement, she went downstairs where she continued her search for valuables. When she later returned to the second floor bedroom, she saw Polites hanging by the neck face down from the door knob. A bloody pillow case covered the victim's head. James was standing over the body. Demolina stood by the nearby staircase. Defendant recounted that, after staring at the body, she and her companions left the apartment with Polites' belongings.
The police asked defendant to give a recorded statement. Defendant replied that she first wanted to talk to her mother. Questioning then stopped. Detective Hynes and Investigator Alver returned to New Jersey with defendant, who was then transported to the Bergen County Prosecutor's Office.
Immediately before she was to be transferred to the jail annex, defendant told Lieutenant Roger Kane that she had lied in her earlier statement and now wanted to tell the truth. After again waiving her constitutional rights, defendant gave a transcribed statement. Defendant admitted that Demolina's plan to rob former escort clients was first discussed in Georgia. She admitted for the first time that Rosario accompanied them to Hippman's apartment and remained in the car with Papaleo while she, Demolina and James robbed the victim. Although she claimed the gun was unloaded, defendant demonstrated how she pointed it at Hippman.
As to the Polites homicide, defendant noted that Rosario accompanied them on the ride to the victim's apartment. She further claimed that Rosario and Papaleo entered the apartment after James surprised Polites with the gun. Defendant repeated her earlier assertion that while in the apartment she overheard a conversation between Demolina and James in which they decided to kill Polites in order to avoid being identified. She again claimed that the conversation took place in Polites' bedroom and that she was not present.
*131 Defendant elected not to testify. Through the testimony of Jonathan Kleinman, a psychologist, and Arnaldo Apolito, a psychiatrist, defendant raised the defense of diminished capacity. We will describe certain aspects of their testimony in greater detail later in this opinion. Suffice it to say at this point, both witnesses asserted that defendant suffered from "post-traumatic stress disorder" as a result of a difficult childhood. They claimed that defendant was in a "disassociative state" when the crimes were committed, and that she was unable to act with purpose or knowledge because her perception of reality was impaired.
The prosecution's expert, Dr. Steven Simring, found no evidence that defendant suffered from post-traumatic stress disorder. He concluded that defendant was fully aware of the nature of the crimes committed and that she purposely and knowingly participated.
It is against this factual backdrop that we address defendant's arguments. Defendant claims (1) testimony relating to Demolina's and James' statements to the police in which they implicated her in the commission of the crimes was erroneously admitted, (2) the prosecutor improperly elicited details about the co-defendants' statements from the expert witnesses, (3) the trial court committed error by admitting evidence pertaining to a threat she made to another inmate following her incarceration, (4) hearsay evidence was improperly admitted under the co-conspirator exception, (5) the trial court committed plain error in its instructions and in its response to a question propounded by the jury during its deliberations, and (6) the aggregate sentence imposed is manifestly excessive. Only the first four of defendant's arguments require extended discussion.

II.
During Kelaher's direct examination, the prosecutor inquired whether the New York City police had apprised him of the arrest of Demolina, James and Rosario. Kelaher replied that he had been so informed on September 13, 1994. In response to further questions, Kelaher noted that he was also told where defendant could be located. In her direct examination of Investigator Alver, the prosecutor elicited testimony that the witness went to the Midtown South Precinct in New York City where he spoke with Demolina and James. The prosecutor then inquired whether Alver "went anywhere" as a result of the time he spent in New York City with Demolina and James. Alver replied that he flew to Conyers, Georgia. The prosecutor asked why the witness had decided to go to Conyers. Alver explained that his purpose was "[t]o locate and arrest" defendant for whom he had obtained arrest warrants for murder and robbery. Alver subsequently described his interview with defendant, noting that he began his interrogation by explaining that "both [Demolina and James] had given sworn statements implicating her" in the robbery and murder. Defendant contends that this evidence violated both the hearsay rule and her right of confrontation. We agree.
In State v. Bankston, 63 N.J. 263, 307 A.2d 65 (1973), our Supreme Court acknowledged the well-settled rule that the right of confrontation is not violated when a police officer explains the reasons he apprehended a suspect or went to the scene of a crime by stating that he did so "upon information received." Id. at 268, 307 A.2d 65. This type of general testimony was said to be admissible to show that the officer was not acting arbitrarily. Ibid. However, when an officer becomes more specific by repeating what some other person told him concerning a crime by the accused, both the hearsay rule and the right of confrontation are violated. Ibid. The Court expanded the applicability of the rule by determining that a specific hearsay statement is not required in order to create an impermissible inference of guilt. Id. at 271, 307 A.2d 65. The Court reasoned, "[w]hen the logical implication to *132 be drawn from the testimony leads the jury to believe that a non-testifying witness has given police evidence of the accused's guilt, the testimony should be disallowed as hearsay." Ibid.
The principle distilled from Bankston and its progeny is that testimony relating inculpatory information supplied by a co-defendant or other non-testifying witness identifying the defendant as the perpetrator of a crime deprives the accused of his or her constitutional rights. See, e.g., State v. Roach, 146 N.J. 208, 224-25, 680 A.2d 634, cert. denied, 519 U.S. 1021, 117 S.Ct. 540, 136 L.Ed.2d 424 (1996); State v. Irving, 114 N.J. 427, 446-47, 555 A.2d 575 (1989); State v. Guzman, 313 N.J.Super. 363, 381, 712 A.2d 1233 (App. Div.), certif. denied, 156 N.J. 424, 719 A.2d 1022 (1998); State v. Torres, 313 N.J.Super. 129, 157, 713 A.2d 1 (App.Div.), certif. denied, 156 N.J. 425, 719 A.2d 1023 (1998); State v. Alston, 312 N.J.Super. 102, 112-14, 711 A.2d 363 (App.Div.1998); State v. Laboy, 270 N.J.Super. 296, 302-05, 637 A.2d 184 (App.Div.1994), State v. Baker, 228 N.J.Super. 135, 139-40, 549 A.2d 62 (App.Div.1988). Where, as here, the defendant does not claim that the police acted arbitrarily in arresting or interrogating her, we perceive no justification for deviating from this well-recognized principle. We thus reject the State's argument that Alver's testimony was not admitted as substantive evidence, but instead pertained solely to the reason why defendant was arrested. The line of demarcation the State attempts to draw is much too tenuous. In any event, no limiting instruction was requested or given. See State v. Maristany, 133 N.J. 299, 309, 627 A.2d 1066 (1993); State v. Laboy, 270 N.J.Super. at 306, 637 A.2d 184. The error so committed deprived defendant of her Sixth Amendment right of confrontation.

III.
For the sake of convenience and clarity, we consider together defendant's second and third arguments. We hold that the prosecutor improperly elicited hearsay testimony from the expert witnesses concerning the inculpatory statements of the co-defendants and the defendant's post-incarceration threat to another inmate. We summarize the salient feature of this evidence.
As we noted earlier, defendant's claim of diminished capacity was presented through the testimony of Dr. Kleinman and Dr. Apolito. Both witnesses asserted that defendant was unable to harbor the requisite mens rea because she was suffering from post-traumatic stress disorder. However, the witnesses differed in the manner in which they arrived at their conclusions. Dr. Kleinman testified that the facts surrounding the crimes were not significant in arriving at his diagnosis. Instead, his conclusions were based on clinical tests and facts relating to defendant's childhood. In contrast, Dr. Apolito heavily relied upon the operative facts pertaining to the crimes in arriving at his conclusions. To a large extent, he assumed as true most of the facts contained in defendant's confession. He also relied upon portions of James' statement. This distinction between the methods by which the experts arrived at their diagnosis is important in assessing the propriety of the prosecutor's cross-examination of the witnesses. We begin our analysis by reciting the applicable legal principle. We then take a closer look at the prosecutor's cross-examination of Kleinman and Apolito.
It has long been the law in New Jersey that "hearsay statements upon which an expert relies are admissible, not for [the purpose of] establishing the truth of their contents, but to apprise the jury of the basis of the opinion reached." State v. Humanik, 199 N.J.Super. 283, 305, 489 A.2d 691 (App.Div.), certif. denied, 101 N.J. 266, 501 A.2d 934 (1985), cert. denied sub nom. Beyer v. Humanik, 493 U.S. 812, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989); see also State v. Lucas, 30 N.J. 37, 79, 152 A.2d 50 (1959); Blanks v. Murphy, 268 N.J.Super. 152, 162-64, 632 A.2d 1264 *133 (App.Div.1993); Dietzeman v. Peterson, 196 N.J.Super. 96, 97-101, 481 A.2d 596 (Law Div.1984). One of the main sources of proof of insanity or diminished capacity is the conduct of the defendant both at the time of the examination and earlier. In this connection, verbal conduct is as important as non-verbal conduct in the eyes of the psychiatrist or psychologist. State v. Lucas, 30 N.J. at 79, 152 A.2d 50. The psychiatrist or psychologist may consider the defendant's statement in a variety of ways. He may be "not so interested in the truth of what is said as he is in the fact it was said." Ibid. The classic illustration is the man who claims he is Napoleon. The psychiatrist or psychologist considers such a statement as important not because of its truth or falsity, but because it is evidence of irrationality. Conversely, some statements of a patient may be considered important because they disclose a factual history that is relevant to the doctor's diagnosis. Stated somewhat differently, the doctor assumes the truth of such statements and considers the facts in terms of their impact upon the patient's mental health or mental disease.
These common sense notions suggest an analytical framework for resolution of evidentiary questions pertaining to psychiatric evidence. The first step is to determine whether the psychiatrist or psychologist actually relied upon the hearsay statement as a necessary element in the formulation of his opinion. In that event, the testimony should be circumscribed by a limiting instruction to the effect that the jury should not consider the hearsay statement as substantive evidence relating to the question of guilt or innocence of the accused, but only as evidence tending to support the ultimate expert conclusion of the doctor on the question of insanity or diminished capacity. Ibid. If it further appears that the expert's opinion "hinges upon the truth of the matter asserted, rather than the fact that it was said, then the jury should be instructed that the probative value of the [doctor's] opinion will depend upon whether there is, from all the evidence in the case, independent proof of the statement made by the accused." Id. at 79-80, 152 A.2d 50. Thus, the second step in resolving questions relating to psychiatric testimony is to determine whether the psychiatrist or psychologist considered the hearsay statement as true in arriving at his diagnosis, and to instruct the jury accordingly.
Applying these principles, we first conclude that Dr. Kleinman did not rely on defendant's recitation of the facts surrounding the crimes in arriving at his conclusions. However, he did rely on defendant's description of her unhappy childhood and other hearsay statements pertaining to her upbringing in determining that she suffered from post-traumatic stress disorder. In Dr. Kleinman's testimony, few references were made to defendant's statements pertaining to the crimes. The judge should have instructed the jury that it could not consider these references as proof of the truth of the assertions made. As to the hearsay statements concerning defendant's upbringing, upon which Dr. Kleinman relied, the judge should have told the jury that the psychologist's opinion depended upon whether there was independent proof of the assertions made. Ibid.; see also State v. Maik, 60 N.J. 203, 208, 287 A.2d 715 (1972), rev'd on other grounds, 68 N.J. 236, 344 A.2d 289 (1975); State v. Burris, 298 N.J.Super. 505, 512-13, 689 A.2d 860 (App.Div.), certif. denied, 152 N.J. 187, 704 A.2d 17 (1997).
More importantly for the purpose of this appeal, the judge should have precluded the prosecutor from cross-examining Dr. Kleinman on the subject of the statements made by Demolina and Jamesspecifically the "numerous discrepancies" between their version of the facts and the roles of the participants and defendant's account. It is true, as the State asserts, that Dr. Kleinman's credibility was a proper subject for cross-examination. However, it is improper for a prosecutor to attack the credibility of a defendant's *134 expert by cross-examining him about the details of inadmissible hearsay on which he did not rely in forming his opinion. State v. Pennington, 119 N.J. 547, 577-83, 575 A.2d 816 (1990); State v. Rose, 112 N.J. 454, 500, 548 A.2d 1058 (1988); State v. Spencer, 319 N.J.Super. 284, 299-303, 725 A.2d 106 (App.Div.1999). Expert testimony is not a vehicle for the "wholesale [introduction] of otherwise inadmissible evidence." State v. Raso, 321 N.J.Super. 5, 16, 728 A.2d 231 (App.Div.), certif. denied, 161 N.J. 332, 736 A.2d 525 (1999). An expert witness "should not be permitted to serve as a conduit for alerting the jury to evidence it would not otherwise be allowed to hear." State v. Burris, 298 N.J.Super. at 512, 689 A.2d 860.
Dr. Apolito's testimony stands on a somewhat different footing. Dr. Apolito began his testimony with a lengthy monologue concerning the facts surrounding the crimes. In the course of this highly selective recitation, the witness repeatedly emphasized defendant's "minimal involvement" in the robberies. As to the Polites homicide, Dr. Apolito characterized defendant's participation as "nil." The doctor's description of the facts was based on defendant's confessions. Moreover, Dr. Apolito stressed that as "a man of this world ... with a great deal of experience," he knew that most people "tend to color the truth," but he nevertheless believed that defendant's recitation of the facts in her confessions was "given to the best of her knowledge" and was "mostly" true. When asked on cross-examination whether he had compared defendant's confessions with the statements of her co-defendants, Dr. Apolito responded that he had done so and volunteered that "[a]s a matter of fact [he had] found quite a bit of confirmation." The witness specifically referred to portions of James' statements which he had underlined. Dr. Apolito stated unequivocally that he "relied on" these passages in arriving at a conclusion with respect to defendant's state of mind.
The prosecutor then elicited testimony concerning portions of James' statement that were inconsistent with defendant's confessions. For example, it will be recalled that defendant claimed to be downstairs when she overheard a conversation between Demolina and James in the upstairs bedroom in which it was agreed that Polites would be killed. James related this conversation in his statement but claimed that defendant was present in the bedroom when it was decided that Polites would be killed. Dr. Apolito was confronted with other parts of James' statement which seemed to indicate that defendant was present in or near the bedroom when Polites was killed. Despite James' statement, Dr. Apolito insisted that defendant was only "minimally involved" in the robbery and murder of Polites.
The prosecutor also confronted Dr. Apolito with Demolina's statement. Demolina claimed that the decision to kill Polites was made in Georgia before she, defendant and James hitchhiked to New York City. She further asserted that the subject was again discussed on Polites' porch where she and her confederates were waiting to gain entry to the victim's apartment. Despite these passages, Dr. Apolito continued to insist that defendant's participation in the robbery and killing was minimal.
We do not suggest that all of the prosecutor's cross-examination of Dr. Apolito was proper. Dr. Apolito never stated or implied that he relied on Demolina's statement in arriving at his conclusion. We find error in the prosecutor's extensive cross-examination of the witness on the subject of Demolina's statement. However, Dr. Apolito testified unequivocally that he relied upon portions of James' statement in arriving at his conclusion that defendant was only minimally involved in the crimes. The witness stated that parts of James' statement "confirmed" his understanding of defendant's role. We reject defendant's argument that the prosecutor was only entitled to cross-examine *135 Dr. Apolito on the passages the witness found were "confirmatory" of defendant's confessions. We find that such a fine parsing of words and phrases would be unduly sterile and unrealistic.
We think that disposition of the issue is controlled by the spirit, if not the wording, of N.J.R.E. 106. That rule states that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at the time of any other part or any other writing or recorded statement which in fairness ought to be considered contemporaneously." Although the rule is new, the underlying principle of testimonial completeness has long guided our courts. Biunno, Current N.J. Rules of Evidence, Comment on N.J.R.E. 106 (1999-2000); cf. State v. Sette, 259 N.J.Super. 156, 185-89, 611 A.2d 1129 (App.Div.), certif. denied, 130 N.J. 597, 617 A.2d 1219 (1992); State v. Lozada, 257 N.J.Super. 260, 271, 608 A.2d 407 (App.Div.), certif. denied, 130 N.J. 595, 617 A.2d 1218 (1992); State v. Colon, 246 N.J.Super. 608, 613, 588 A.2d 440 (App.Div.1991); State v. Gomez, 246 N.J.Super. 209, 216-17, 587 A.2d 272 (App. Div.1991). It has been said that this and the related "opening the door" doctrine are essentially "rule[s] of expanded relevancy and authorize[ ] admitting evidence which would have been irrelevant or inadmissible in order to respond to admissible evidence that generates an issue...." State v. James, 144 N.J. 538, 554, 677 A.2d 734 (1996); see also State v. Marshall, 148 N.J. 89, 168-69, 690 A.2d 1, cert. denied, 522 U.S. 850, 118 S.Ct. 140, 139 L.Ed.2d 88 (1997). "Th[ese] doctrine[s] operate[ ] to prevent a defendant from successfully excluding from the prosecutor's case-in-chief inadmissible evidence and then selectively introducing pieces of this evidence for the defendant's own advantage...." State v. James, 144 N.J. at 554, 677 A.2d 734.
Dr. Apolito's extensive references to the facts set forth in defendant's confession did not "open the door" to admission of Demolina's contradictory statement. But the doctor's unequivocal testimony that he relied on portions of James' statement, which he characterized as confirming defendant's account of the crimes, did open the door to introduction of other parts of that statement. Should there be a retrial, the court and counsel should be guided accordingly.
We next turn to admission of testimony relating to a threat defendant made against another inmate while awaiting trial. The prosecutor cross-examined Dr. Kleinman and Dr. Apolito on the subject despite the fact that neither witness considered the threat in arriving at his conclusion concerning diminished capacity. The prosecutor also erred when she raised the subject in the course of her direct examination of Dr. Simring, who similarly testified that he did not consider the threat in arriving at his determination respecting defendant's mental state.

IV.
We also find error in the admission of Magda Rahey's testimony concerning her telephone conversation with Demolina before and after Polites' murder. This testimony was admitted under the co-conspirator exception to the hearsay rule. Under that exception, "a statement made at the time the party and the declarant were participating in a plan to commit a crime or civil wrong [is admissible if] the statement was made in furtherance of the [unlawful] plan." N.J.R.E. 803(b)(5). Thus, "where two or more persons are alleged to have conspired to commit a crime or a civil wrong, any statement made by one during the course of and in furtherance of the conspiracy is admissible in evidence against any other member of the conspiracy." State v. Phelps, 96 N.J. 500, 508, 476 A.2d 1199 (1984). This rule is applicable where it is charged that a crime was committed in pursuance of a conspiracy, whether or not the indictment contains a conspiracy count. State v. Clausell, 121 N.J. 298, 336, 580 A.2d 221 *136 (1990); State v. Louf, 64 N.J. 172, 177, 313 A.2d 793 (1973). The hearsay exception does not abridge a defendant's right to confront the witnesses against him because the circumstances afford a sufficient guarantee of testimonial trustworthiness. State v. Harris, 298 N.J.Super. 478, 487, 689 A.2d 846 (App.Div.), certif. denied, 151 N.J. 74, 697 A.2d 546 (1997); State v. Varona, 242 N.J.Super. 474, 483, 577 A.2d 524 (App.Div.), certif. denied, 122 N.J. 386, 585 A.2d 389 (1990).
N.J.R.E. 803(b)(5) is coextensive with the federal co-conspirator hearsay exception. State v. Taccetta, 301 N.J.Super. 227, 251, 693 A.2d 1229 (App.Div.), certif. denied, 152 N.J. 187-88, 704 A.2d 17 (1997). Federal authorities hold that there is no requirement under the rule that the person to whom the statement is made be a co-conspirator. United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir.), cert. denied sub nom. Lavery v. United States, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989).
However, to be admissible under N.J.R.E. 803(b)(5), the prosecution must establish that a co-conspirator's statement meets the following three-part test: "First, the statement must have been made in furtherance of the conspiracy. Second, the statement must have been made during the course of the conspiracy. Lastly, ... there must be evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it." State v. Phelps, 96 N.J. at 510, 476 A.2d 1199 (citations omitted).
The first two parts of the test reflect notions that an agent's statements are vicariously attributable to a principal. Ibid. The rationale is that participation in a conspiracy confers upon co-conspirators the authority to act on another's behalf to achieve the goals of the common scheme. Conspirators should be responsible for statements uttered by co-conspirators to further the common plan. Ibid.
The last requirement, that the existence of a conspiracy and defendant's participation be demonstrated by evidence other than the hearsay statement sought to be admitted against the co-conspirator, reduces the danger that a defendant might be convicted solely on the basis of evidence that he or she had no opportunity to impeach or refute. State v. Hunt, 115 N.J. 330, 367, 558 A.2d 1259, reconsideration denied, 117 N.J. 152, 564 A.2d 873 (1989); State v. Phelps, 96 N.J. at 510-11, 476 A.2d 1199. The independent evidence must be substantial enough to engender a strong belief in the conspiracy's existence and defendant's participation. Specifically, the prosecution has the burden of satisfying the third part of the test by a fair preponderance of the evidence. State v. Clausell, 121 N.J. at 337, 580 A.2d 221; State v. Phelps, 96 N.J. at 510, 476 A.2d 1199. However, the trial court, in determining whether the co-conspirator hearsay exception applies, may consider the co-conspirator's hearsay declaration in conjunction with independent evidence if it is satisfied that such declaration is reliable and that there is other evidence substantial enough to engender a belief in the conspiracy's existence and the defendant's participation in it. State v. Phelps, 96 N.J. at 511, 518-19, 476 A.2d 1199.
We are satisfied that the foundational basis was not met in this case. The record does not support the thesis that Demolina's statements were made "in furtherance" of the conspiracy. The State presented no evidence that Demolina's telephone calls "promoted, or [were] intended to promote, the goals of the conspiracy." United States v. Beech-Nut Nutrition Corp., 871 F.2d at 1199; see also United States v. Hamilton, 689 F.2d 1262, 1270 (6th Cir.1982), cert. denied sub nom. Wright v. United States, 459 U.S. 1117, 103 S.Ct. 753, 74 L.Ed.2d 971 (1983). These conversations can fairly be characterized as "idle chatter," United States v. Beech-Nut Nutrition Corp., 871 F.2d at 1199; see also United States v. Lieberman, *137 637 F.2d 95, 103 (2d Cir.1980), not statements and declarations designed to advance or achieve conspiratorial objectives. At no time did Demolina seek Rahey's help in carrying out the scheme to rob and kill her former escort service patrons. Indeed, it would appear that Rahey attempted to persuade Demolina not to implement her plan. While it is true that Rahey subsequently assisted in secreting some of the stolen articles, those acts occurred after her conversations with Demolina and after the conspiratorial objectives had been accomplished.
We need not determine whether the second and third prongs of the test for admission of co-conspirator statements were met. All foundational requisites must be satisfied in order to allow the admission of such evidence. The State's failure to establish that the statements were made to promote or further the unlawful plan precluded admission of testimony relating to the telephone conversations.
As an afterthought, the State argues that Demolina's statements to Rahey were admissible as adoptive admissions. The prosecutor points to the fact that Rahey heard "background" voices, one having a distinct southern accent. It is thus argued that defendant was present during Demolina's telephone conversation with Rahey and "adopted by word or conduct" the incriminating statements made. N.J.R.E. 803(b)(2). However, the State failed to produce any evidence that defendant was present for the entire conversation or at least for the inculpatory portions, or that she overheard Demolina's statement that the trio intended to rob and kill her former customers.

V.
We are satisfied that the errors we have described were capable of producing an unjust result with respect to the convictions for purposeful or knowing murder. But we are equally convinced that these errors did not taint the remaining convictions. The evidence overwhelmingly established that defendant purposely participated in the kidnaping and robbery of Hippman and Polites. As to Polites, the jury, which was properly instructed, clearly concluded that the victim's death was not "too remote, accidental in its occurrence, or dependent on another's volitional act to have a just bearing on the [defendant's culpability] or on the gravity of [her] offense." N.J.S.A. 2C:2-3b and -3c; see also State v. Martin, 119 N.J. 2, 32, 573 A.2d 1359 (1990). The State's proofs established defendant's complicity in the felony-murder beyond any possible doubt. The erroneously admitted evidence focused primarily on the issue whether defendant intended to kill Polites. Our reversal of defendant's conviction for purposeful or knowing murder thus fully vindicates defendant's rights.
We thus conclude that defendant was fairly convicted of two counts of first degree kidnaping, two counts of first degree robbery, two counts of possession of a firearm for an unlawful purpose, two counts of possession of a handgun without a permit, and two counts of felony murder. We reject defendant's remaining arguments as they pertain to those counts. R. 2:11-3(e)(2). We unmerge defendant's conviction for felony murder committed during a robbery. The State may choose to retry defendant for purposeful or knowing murder or stand pat with the convictions we have affirmed. If the State chooses not to retry defendant for purposeful or knowing murder, it will be necessary for the trial court to recast the aggregate sentence imposed. We thus need not address defendant's claim that the sentence is excessive.
The judgment is affirmed in part and remanded in part. The matter is remanded to the Law Division for further proceedings consistent with this opinion.