# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1503-16T3

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

 Plaintiff-Respondent,

v.

T.T.,

 Defendant-Appellant,

and

M.T.,

 Defendant.

_____

IN THE MATTER OF H.T.,

 a Minor.

_____

  Submitted December 4, 2018 – Decided December 20, 2018

  Before Judges Suter and Firko.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Sussex County. Docket No. FN-19-0059-15.

Joseph E. Krakora, Public Defender, attorney for appellant (Lora B. Glick, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason W. Rockwell, Assistant Attorney General, of counsel; Joann M. Corsetto, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Lisa M. Black, Designated Counsel, on the brief).

PER CURIAM

Defendant T.T. (Terry)[1] appeals the November 28, 2016 Family Division order under N.J.S.A. 9:6-8.21(c) that she abused or neglected her child H.T. (Hanna) by exaggerating the child's symptoms and causing her to believe she was a sick child in need of services. We affirm the court's order because it is fully supported by the evidence. We reject defendant's claim she lacked notice of the claims against her or that the court's order was impermissibly based on hearsay.

---

[1] We use initials and fictitious names throughout the opinion to protect the confidentiality of the parties and children.

2                                                                              A-1503-16T3

I.

When Hanna was six years old, her parents did not meet her at the bus stop and could not be located. Her school contacted the police, who in turn contacted the Division of Child Protection and Permanency (DCPP). Hanna told DCPP's investigator her father was physically abusive to her and there was domestic violence between her parents. At 10:30 that night, Terry's husband and Hanna's father, M.T. (Michael), went to the police station and explained that they had been looking for an apartment, became lost and ran out of gas, twice.[2] They had not called or asked anyone to take care of Hanna nor did they explain their lapse.

DCPP took custody of Hanna on an emergency basis,[3] filing an order to show cause and verified complaint under Title Nine for her custody, care and supervision. The Family Part judge found that DCPP's removal was appropriate because neither parent had been available for the child. At the hearing, DCPP's caseworker explained that Terry previously contacted DCPP for assistance in dealing with Hanna's behavior. Its collateral investigation was positive

---

[2] Michael is not an appellant in this case.

[3] DCPP filed a notice of emergency removal without court order under N.J.S.A. 9:6-8.29 and 9:6-8.30.

A-1503-16T3

regarding Terry's parenting. The court ordered Hanna to be returned to Terry, but also ordered the case to remain open for services. Both parents were ordered to participate in psychiatric and psychological evaluations.

By the return date of the order to show cause in July 2015, DCPP had obtained additional information. Hanna's school records showed she had been absent sixty-three times for a total of eighty-one days in one academic year. There were doctor's notes for just a portion of the absences. Hanna's medical records reported that she was diagnosed by her pediatrician with Attention Deficit/Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD), but she had not been evaluated by a neurologist. Family Preservation Services reported that Terry discussed age inappropriate things in front of Hanna. It recommended in home counseling.

DCPP told the court of its concern that Terry showed a pattern of behavior with Hanna similar to a pattern it had seen in its previous involvement with Terry and another child, S. (Steve). Steve had been examined for a host of medical disorders, at Terry's urging, including Tourette's, Asperger's and a pervasive developmental disorder. Terry was evaluated in 2000 by the Audrey Hepburn Children's House (AHCH). The report indicated Terry met the criteria for Fictitious Disorder Imposed on Another (FDIA), a disorder where a caretaker

"provide[s] information that exaggerates, creates or induces symptoms in a child in their care."[4] The judge granted DCPP's request for an evaluation of the family by Dr. Janet Cahill, a specialist in the diagnosis and treatment of FDIA. Additionally, the parents were to complete a parenting program. Within a month, DCPP again removed Hanna from her parents' custody on an emergent basis, filing an amended complaint thereafter for Hanna's custody, care and supervision under Title Nine.

Dr. Cahill's preliminary parental capacity evaluation concluded that Terry met the criteria for FDIA. She completed her evaluation based on her in-person meeting with Terry, a review of prior reports, Hanna's school logs and the excuse notes regarding Hanna's absences from school. The school logs showed that Terry believed Hanna suffered from:

> attention deficit hyperactivity disorder, an auditory processing problem, visual processing problem . . . [and] that she required dietary restrictions. She had severe behavioral problems. She had sleep disturbances. She engages in aggressive behavior such as sucking her thumb, she was fat, physically unfit . . . she gets on the floor, she can't get up. Her back and

---

[4] FDIA previously was referred to as "Munchausen Syndrome by Proxy." Munchausen syndrome is "a form of child maltreatment or abuse inflicted by a caretaker . . . with fabrications of symptoms and/or induction of signs of disease, leading to unnecessary investigations and interventions, with occasional serious health consequences, including death of the child." Stedman's Medical Dictionary 1906 (28th ed. 2005).

feet hurt. . . . She's breathing hard. She gets headaches. And then in the records for the excuses, she talked about runny noses, sore throats, headaches, a number of those kinds of problems.

Dr. Cahill testified this was "a very long list of disorders where the source of the information is exclusively coming from mom. No one else is seeing these things except in very rare occasions." Dr. Cahill recommended removing Hanna from the home and placing her in a resource home to see if the symptoms complained of by Terry persisted.

The court found removal of Hanna was appropriate and supported by the record because of family dysfunction and safety issues. The court placed Hanna in DCPP's custody, ordering a temporary six to eight week separation from Terry and Michael with no visitation, to see whether the symptoms that Terry reported regarding Hanna continued in Terry's absence.

Over the next several months, the court ordered Terry to attend therapy. A hearing was conducted on whether Terry should have supervised visitation with Hanna. Dr. Cahill testified that visitation would be emotionally disruptive to Hanna until Terry engaged in therapy to gain insight that her behavior was "disruptive and abusive towards the child." Moreover, the separation had "vastly improved this child's functioning." The court found that Hanna would not be benefited by Terry's visitation.

6

The court conducted the Title Nine fact-finding hearing on several dates beginning in mid-2016. Dr. Cahill testified she conducted a parenting capacity evaluation to determine whether the parents could safely and effectively parent Hanna by providing "minimally adequate parenting." In that evaluation, Dr. Cahill noted Terry reported Hanna had a number of physical and emotional problems that other professionals involved with the family had not observed. In addition to the eighty-one days Hanna was absent from school, Terry also asked for services or accommodations for Hanna that included half-day school attendance, a restricted diet, and time to spend with "mommy."

Dr. Cahill reviewed the earlier report from the AHCH that expressed similar concerns about Terry's treatment of her other children when they were younger. That report revealed a similar pattern of deliberate exaggeration and fabrication of symptoms and indicated Terry was exhibiting FDIA criteria. Dr. Cahill saw parallels with how Terry treated Steve and how she now was parenting Hanna. There were many inconsistencies between what Terry was saying about Hanna and what was in the records. Dr. Cahill reviewed notes by the doctors and Terry about school absences, but these did not explain all of the absences; she reviewed the school log that showed minor concerns by the teacher followed by more extensive issues raised by Terry. She spoke with Hanna, who

7

told Dr. Cahill her father was "bad." Dr. Cahill interviewed and observed Terry, who expressed no concerns about her own parenting abilities.

Dr. Cahill testified that Terry met the criteria for FDIA and was harming Hanna by causing social isolation, by keeping her home sick, asking for services at school that were not needed and by telling others that Hanna had behavioral issues when she did not. Once Hanna was separated from Terry, there was no report of ADHD symptoms. Dr. Cahill testified:

> she's eating fine. She's not having any behavioral problems. She's not overweight. She's not falling down. She's not having seizures. She doesn't have auditory processing . . . symptoms of any kind . . . .

There had been a "dramatic change in her behavior." She "went from all these things to basically nothing except for minor stuff that . . . any child would have."

A DCPP supervisor testified about Terry's history with DCPP. There were similarities regarding her older son, Steve, who Terry said had ADHD at an early age. Terry was suspected then of FDIA. She testified that once Hanna was separated from Terry in August 2015, she ate without dietary restrictions and did not act out of control. She could be easily redirected. The resource parents also reported Hanna was doing well.

The Center for Evaluation and Counseling evaluated the "overall psychological functioning of all family members, their service needs and

A-1503-16T3

provided recommendations." A psychologist with the Center, performed a clinical interview with Hanna. He did not observe any developmental delays or behavior associated with ADHD. Hanna said that her mother told her to talk about her father's abusive behaviors. When she was observed with him, however, they "seemed to be getting along very well," but Hanna said her father was "pretending." The Center recommended that Hanna would benefit from separation and psychotherapy. She had been exposed to "parental conflict, parental influence and the perception of her father was influenced by her mother."

Hanna's caseworker testified that Hanna was "friendly, outgoing." Hanna did not have any trouble speaking with her or staying on topic; her behavior was not hyper or erratic. Hanna was not exhibiting any ADHD behaviors or adjustment disorders at the resource home; there were no issues regarding absences from school.

Hanna's kindergarten teacher testified that Hanna was absent eighty days that year. The absences did not allow Hanna to develop a routine. She was loud in the classroom and, although she liked being with other children, at times had difficulty getting along with the others. She had difficulty staying focused but could be redirected. She had no auditory processing issues.

The kindergarten teacher maintained a parent teacher communication notebook with Terry where they exchanged notes daily. Hanna's mother described Hanna's behavior at home in detail in the notebook. She did not observe these behaviors in the classroom to the extent reported by Terry. Other regimes imposed by Terry required Hanna to have certain dietary restrictions, a longer rest time, required daily walks around the school and restricted her running during recess. At the end of the year, Hanna was slightly behind in reading, but was promoted to first grade. She testified she had no reason to report any abuse or neglect.

By the beginning of first grade, Hanna had been separated from her parents and was residing with a resource family. Her first grade teacher testified Hanna did not have trouble focusing, was not hyperactive, was a good listener and absent only eight days. She had become good with routines, could be redirected and was "very socialized with everybody." Although she initially was behind in reading, at the end of first grade, she was on grade level. She did not need special accommodations in class. She "acted like a normal child."

The school principal testified that during her kindergarten year, sometimes Hanna was brought to the office because she did not follow the school rules. In her first grade year, Hanna was pleasant and interacted with the

principal and others. She testified Hanna "did very well in first grade." She did not need a classroom aide.

During the hearing, DCPP received an evaluation by Dr. Eileen Kohutis, defendant's psychology expert. Her report addressed whether Terry manifested FDIA. DCPP clarified that the question for the hearing was "whether or not the child was placed at substantial risk of harm due to the inability of the parents as a couple and individually to . . . provide a safe, stable home environment for their child." Because Dr. Kohutis did not address whether the removal was justified or whether Terry showed the skills necessary or appropriate to parent Hanna, DCPP asserted her testimony was irrelevant.

Dr. Kohutis testified that Terry had a long psychiatric history including disorders involving "depression, anxiety, Tourette's, ADHD, seizures and bipolar disorder." She has two older children from a prior marriage. Her marriage to Michael was "difficult" because of conflicts between them; Michael was living in a van in the driveway.

Dr. Kohutis testified there was nothing to indicate Terry falsified the signs and symptoms of ADHD regarding her daughter. She acknowledged Hanna was doing better in first grade than kindergarten, but there may be other reasons for this besides the separation from Terry. Dr. Kohutis did not have evidence Hanna

11

was subjected to medical treatment or procedures that were not necessary; Terry was simply advocating for her child. She felt Dr. Cahill placed a great deal of emphasis on the AHCH report. Dr. Kohutis did not have an opinion about whether there should be renewed contact between Terry and Hanna.

Dr. Kohutis testified, however, that Terry had "personality traits that [were] impeding her ability to parent." She had limited insight, could be overbearing, had unstable interpersonal relationships, could be demanding and had little ability to reflect on how to change her behavior. Some of these issues could be addressed through further services and some not, but a further assessment would be required. Dr. Kohutis acknowledged that in her interview with Hanna, she did not observe any sensory processing or auditory issues, trouble controlling her body, following instructions, sitting still, processing information, being aggressive, symptoms consistent with ADHD—all of which Terry said in the school log her daughter exhibited.

On November 28, 2016, the judge found Terry had abused or neglected Hanna under the provisions of N.J.S.A. 9:6-8.21(c)(4), finding that the child's mental and emotional condition was harmed by Terry "through intentional, persistent, pervasive alienation of the child to the parent." The court reviewed the testimony and evidence from the hearing including her history with DCPP,

A-1503-16T3

the report from the AHCH regarding Steve and how that compared with Terry's parenting of Hanna, the school communication log, her absences from school and lack of medical support for many of them, and that professionals did not observe the behaviors or conditions that Terry said she saw in her daughter. The court credited Dr. Cahill's testimony that Terry met the criteria for FDIA.

The court found by a preponderance of the evidence that Hanna was neglected under Title Nine. Terry "exaggerated medical symptoms for [Hanna] as she had with [Steve]." She reported ADHD but none of the other professionals reported it. No professional reported the auditory or visual sensory issues Terry reported. Hanna missed eighty-one days of school but there were only seven doctor's notes. Terry said the child had a behavioral problem at home but at school the teachers reported she could be easily redirected. She was behind in reading at the end of kindergarten. Hanna was subjected to evaluations and services not supported by the facts. None of the services Terry insisted on for Hanna were supported. Although the court found Dr. Cahill was correct that Terry evidenced FDIA, that diagnosis was not necessary to sustain an abuse and neglect finding under Title Nine.

In addition, she coached the child, causing the child to confide the father had harmed her, which alone met the statutory standard of "impairing the child's

mental and emotional condition through an intentional, persistent, pervasive alienation of the child to the parent."[5]  Her own expert said that she had personality traits that impeded her ability to meaningfully parent.  Some of the traits could not be effectively remediated with services.

On appeal, defendant contends the court violated her right to due process and to parent her child by changing the theory of its case half way through the hearing to a claim that was not included in the amended complaint.  Originally, the issue for trial was whether defendant suffered from FDIA.  The court's order, however was based on a finding that Hanna was at risk of harm because of Terry's inability to meet her basic needs.  Defendant claims the court erred by relying on the net opinion of Dr. Cahill which was speculative.  She argues the court applied the wrong legal standard and that the evidence did not support the verdict.  There is no merit in these arguments.

## II.

We note our general deference to Family Part judges' fact-finding because of their "special jurisdiction and expertise in family matters."  <u>Cesare v. Cesare</u>,

---

[5] The court did not find that Michael abused or neglected Hanna, but according to Michael's expert witness, he was not then in a position to parent Hanna.  The court also terminated the case.  DCPP indicated it intended to file a guardianship action to terminate parental rights.

14

154 N.J. 394, 413 (1998).  See also N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014).  We will uphold fact-finding that is supported by sufficient, substantial and credible evidence in the record.  See N.J. Div. of Youth & Family Servs. v. L.L., 201 N.J. 210, 226 (2010); N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007).  However, we will not hesitate to set aside a ruling that is "so wide of the mark that a mistake must have been made."  M.M., 189 N.J. at 279 (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)).  The court's interpretation of the law or its legal conclusions are reviewed de novo.  See State in Interest of A.B., 219 N.J. 542, 554-55 (2014).

"Title [Nine] controls the adjudication of abuse and neglect cases."  N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010).  N.J.S.A. 9:6-8.21, in pertinent part, defines an "[a]bused or neglected child" as:

> a child whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so . . . .
>
> [N.J.S.A. 9:6-8.21(c)(4).]

Whether a parent has committed abuse or neglect "must be analyzed in light of the dangers and risks associated with the situation." N.J. Div. of Youth & Family Servs. v. S.I., 437 N.J. Super. 142, 153 (App. Div. 2014) (quoting N.J. Dep't of Children & Families v. R.R., 436 N.J. Super. 53, 58 (App. Div. 2014)). The cases are fact sensitive.

Defendant contends her due process rights were infringed when DCPP changed course during the hearing, no longer seeking a specific finding about FDIA, but rather a finding that Terry could not meet Hanna's basic needs or provide her with a safe home environment. Terry claims she had no notice of the new claim or ability to change her defense strategy. She further claims her right to parent her child was infringed because the separation test prevented defendant from reuniting with her daughter, violating her right of parenting.[6] See Wisconsin v. Yoder, 406 U.S. 205 (1972) (fundamental right to raise children); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999).

Due process is "the fundamental notion that litigants are entitled to notice and a meaningful opportunity to be heard." New Jersey Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 119 (2011). "Those plain notions of procedural due process—fair notice and a meaningful opportunity to be heard—must occupy

---

[6] These issues were not raised before the trial court.

the central stage of analysis." Id. at 120. It is a flexible concept "and calls for such procedural protections as the particular situation demands." Id. at 119 (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).

Defendant's argument lacks merit. The amended complaint provided her with notice that DCPP was concerned with a number of issues. It alleged Hanna's "physical, mental, or emotional condition ha[s] been impaired or is in imminent danger of becoming impaired as the result of the failure of [her] parents to exercise a minimum degree of care (1) in supplying [her] with adequate food, clothing, shelter, education, medical or surgical care." By incorporation of DCPP's court report from June 2015, the amended complaint alleged facts, including concerns "related to [Terry's] past history with the Division," "her current parenting of [Hanna]," difficulty setting up visits, Dr. Cahill's report that Terry met the criteria for FDIA, Hanna's school attendance records, that she was behind in reading at the end of kindergarten based on excessive absences, and that her parents had verbal and physical conflict.

The fact that the Division did not specifically seek a finding that Terry had FDIA did not change its overall assertion that Hanna's "physical, mental, or emotional condition had been impaired or was in imminent danger of becoming impaired as the result of the failure of [her] parents to exercise the minimum

17

degree of care." It is clear Terry was on notice as to the Division's claim of abuse or neglect. She also had a meaningful opportunity to respond to the claims at each stage of the proceedings.

Regarding her claim that she was deprived of the constitutional right to parent Hanna, that right has limitations where the child has been abused or neglected within the meaning of N.J.S.A. 9:6-8.21. Further, defendant was not deprived of the ability to reunite with the child, but she did not engage in therapy, complete her evaluations, or stay in contact with the DCPP.

Defendant argues the court erred in accepting Dr. Cahill's FDIA diagnosis because it was based on inadmissible hearsay consisting in large measure of the AHCH report about Terry's son Steve. Defendant argues Dr. Cahill's finding that Terry has FDIA was based on her personal opinions and contradicted by the evidence, rendering her opinion a net opinion. These arguments are not supported by the testimony and evidence.

Diagnoses by non-testifying experts are inadmissible hearsay and cannot be offered for their truth. See Agha v. Feiner, 198 N.J. 50, 63-64 (2009). The hearsay statements in the AHCH report could not be used as "substantive evidence" but "only as evidence tending to support the ultimate expert conclusion of the [witness]." State v. Vandeweaghe, 351 N.J. Super. 467, 480

18

(App. Div. 2002) (quoting State v. Farthing, 331 N.J. Super. 58, 78 (App. Div. 2000)).

Dr. Cahill did not simply rely on the AHCH report for her opinions. She conducted a parental capacity evaluation of Terry, personally observed Hanna interact with her parents, reviewed Hanna's school records and the letters sent by Terry to provide excuses for some of Hanna's excessive absences, and examined Hanna's medical records and school communication log in formulating her opinions. Her opinions, therefore, were based on her own examinations and interviews, evidence that was admitted in trial and data typically relied on such as past reports, medical records, and school records.

Dr. Cahill's opinion was not a net opinion. N.J.R.E. 703 mandates that expert opinion be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). The net opinion "requires an expert to give the why and wherefore of his or her opinion, rather than a mere conclusion." State v. Townsend, 186 N.J. 473, 494 (2006) (citing Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div.

2002)).  Dr. Cahill's opinion was supported by the psychological testing, DCPP records, and interview with Terry and Hanna.  It clearly provided the whys and wherefores for her opinions.

Defendant contends the abuse and neglect order was not supported by the evidence.  She argues the claim of parental alienation was not supported because the child was not afraid of her father.  She asserts there was no educational neglect because Hanna was able to graduate to first grade and that the court did not make a finding Terry's conduct was grossly negligent or reckless, which was required under Title Nine.

We agree with the trial court that there was substantial evidence to support the conclusion of abuse and neglect under Title Nine.  The evidence was not refuted that Terry coached the child into believing that her father was "bad" and abused her.  Again, we agree with the court that this met the statutory standard of "impairing the child's mental and emotional condition through an intentional, persistent, pervasive alienation of the child to the parent."  As for educational neglect, the evidence showed the child had difficulty adjusting to school and was behind in reading because of her eighty-one absences.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

20                                                                    A-1503-16T3